**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SL-X TRADING EUROPE LIMITED, SL-X
TECHNOLOGY UK LIMITED, SL-X TRADING
USA LLC, AND SL-X TECHNOLOGY USA LLC,

        Plaintiffs,

    -against-

BANK OF AMERICA CORPORATION; MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; MERRILL LYNCH L.P.
HOLDINGS, INC.; MERRILL LYNCH
PROFESSIONAL CLEARING CORP.; CREDIT
SUISSE AG; CREDIT SUISSE GROUP AG;
CREDIT SUISSE SECURITIES (USA) LLC;
CREDIT SUISSE FIRST BOSTON NEXT FUND,
INC.; CREDIT SUISSE PRIME SECURITIES
SERVICES (USA) LLC; THE GOLDMAN SACHS
GROUP, INC.; GOLDMAN, SACHS & CO. LLC;
GOLDMAN SACHS EXECUTION & CLEARING,
L.P.; J.P. MORGAN CHASE & CO.; J.P. MORGAN
SECURITIES LLC; J.P. MORGAN PRIME, INC.;
J.P. MORGAN STRATEGIC SECURITIES
LENDING CORP.; J.P. MORGAN CHASE BANK,
N.A.; J.P. MORGAN INSTITUTIONAL
INVESTMENTS INC.; MORGAN STANLEY;
MORGAN STANLEY CAPITAL MANAGEMENT,
LLC; MORGAN STANLEY & CO. LLC; MORGAN
STANLEY DISTRIBUTION, INC.; PRIME
DEALER SERVICES CORP.; STRATEGIC
INVESTMENTS I, INC.; UBS GROUP AG; UBS
AG; UBS AMERICAS INC.; UBS SECURITIES
LLC; UBS FINANCIAL SERVICES INC.; UBS
INVESTMENT BANK; UBS ASSET
MANAGEMENT (US) INC.; UBS FUND
SERVICES (USA) LLC; EQUILEND LLC;
EQUILEND EUROPE LIMITED; and EQUILEND
HOLDINGS LLC,

        Defendants.

---

Case No: 19-cv-4885

**COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PARTIES ................................................................................................................. 4

JURISDICTION AND VENUE ............................................................................. 16

FACTUAL ALLEGATIONS .................................................................................. 17

    I.      THE RELEVANT MARKET ..................................................................... 17

          A.     Stock Lending Generally ............................................................. 17

          B.     The Stock Lending Market ........................................................... 19

          C.     Agent Lenders ............................................................................. 20

          D.     Broker-Dealers ........................................................................... 20

          E.     Current Market Practice .............................................................. 21

    II.     SL-X 's PRODUCT ................................................................................... 23

    III.    DEFENDANTS INITIALLY PRAISE AND THEN LATER
          UNDERMINE SL-X AND ITS PRODUCT ....................................... 26

          A.     SL-x and Its Sales Efforts ........................................................... 26

          B.     Contact with EquiLend ............................................................... 28

          C.     Contact with Bank of America .................................................... 29

          D.     Contact with Credit Suisse .......................................................... 30

          E.     Contact with Goldman Sachs ....................................................... 32

          F.     Contact with JP Morgan ............................................................... 33

          G.     Contact with Morgan Stanley ...................................................... 35

          H.     Contact with UBS ........................................................................ 35

          I.     Communications with Other Potential Customers ....................... 36

          J.     Communications with Clearinghouses ......................................... 38

    IV.    DEFENDANTS' SECRET AGREEMENT TO UNDERMINE
          SL-X AND OTHER SIMILAR PRODUCTS ..................................... 39

V.      SL-X IS FORCED OUT OF BUSINESS AND PURCHASED BY EQUILEND ................................................................. 41

VI.     DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM ...................................................... 43

VII.    OTHER FACTS DEMONSTRATE THE PLAUSIBILITY OF DEFENDANTS' CONSPIRACY ......................................... 45

        A.      The Antiquated Structure of the Stock Loan Market ................................. 45

        B.      Defendants' Actions Against Other Modernizing Companies ................................................................................ 48

                i.      AQS ................................................................. 48

                ii.     Data Explorers ................................................. 51

        C.      Defendants' Prior Illegal Conduct .......................... 54

                i.      Municipal Bond Investments Market ................ 55

                ii.     LIBOR Market .................................................. 57

                iii.    FX Spot Market ................................................. 57

                iv.     ISDAfix .............................................................. 61

                v.      Credit Default Swaps ....................................... 62

VIII.   THE USE OF EQUILEND AS A VEHICLE FOR ILLEGAL CONDUCT TRIGGERS SPECIAL SCRUTINY ............................. 63

IX.     EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS ................................................................... 70

VIII.   PENDING LITIGATION WITH SL-X IP S.Á.R.L. ............... 73

CAUSES OF ACTION ................................................................. 73

PRAYER FOR RELIEF ............................................................... 78

JURY DEMAND ......................................................................... 79

## INTRODUCTION

Plaintiffs SL-x Trading Europe Limited, SL-x Technology UK Limited, SL-x Trading USA LLC, and SL-x Technology USA LLC ("Plaintiffs" or collectively "SL-x") by and through their undersigned counsel alleges as follows:

1.      This is antitrust action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  Plaintiff SL-x is a company that was forced out of business due to a criminal conspiracy in the "stock loan" or "stock lending" market.  SL-x brings suit to recover damages, including treble damages and attorney's fees, sustained as a result of this illegal collusive conduct.

2.      SL-x was a financial technology startup, founded by individuals with significant experience in both securities lending and online financial marketplaces.  Using its patented software, SL-x offered a fast, sophisticated system where bids and offers for stock lending transactions could be communicated in real time, allowing market participants to compare rates and more efficiently execute stock loans.

3.      Defendants include some of the largest banks in the world.  Acting together, they have exerted a stranglehold over stock lending market, charging exorbitant fees to connect borrowers and lenders and preventing either side from knowing the true "cut" that Defendants charge as middlemen.  This opaque system has permitted Defendants to extract enormous economic rents, amounting to more than $9 billion dollars per year.

4.      In order to thwart competition, the stock lending market employs crude and outdated methods for executing transactions.  Basic features, such as fully electronic trading, central clearing, anonymous trading, and live data concerning pricing and availability, long staples of numerous other financial markets, are conspicuously absent in stock lending.

5.      SL-x's platform would have offered significant benefits to all participants in the stock lending market, including to Defendants themselves.  SL-x's technology was a significant improvement over the crude tools used by Defendants' employees to execute stock loans and would have allowed them to perform their duties more quickly and more effectively.  By consolidating multiple channels of communication into a single application, SL-x also dramatically simplified record-keeping and compliance.  And critically, the central clearing offered by SL-x would have dramatically reduced the capital requirements of the stock lending business, permitting Defendants to either expand their operations or to invest those sums in other lucrative endeavors.

6.      But while SL-x promised clear benefits to Defendants' individual businesses, the transparency it offered also posed a risk to Defendants' collusive cabal.  By permitting market participants to more easily compare offers and see the prices at which stock lending transactions were executed, SL-x would have exposed the exorbitant spreads charged by Defendants to their customers and the high economic rents extracted by Defendants collectively.

7.      Concerned about this threat to their hegemony, Defendants acted decisively and illegally to strangle SL-x before it was able to establish itself in United States markets. Defendants organized a group boycott to starve SL-x of the customers and liquidity that it needed to grow.  And Defendants used their enormous market power to pressure other financial institutions not to do business with SL-x.  Faced with this illegal group boycott, SL-x was forced to close its doors and sell its valuable technology off for scrap.

8.      Defendants' collective conduct has only recently come to light.  In August of 2017, a class action lawsuit was brought in this Court by investors who paid inflated fees to Defendants because of the same conspiracy that doomed SL-x.  That case is captioned *Iowa*

*Public Employees' Retirement System et al. v. Bank of America Corporation et al.*, Case No. 17 Civ. 6221 (KPF).

9.     The Amended Complaint in that action chronicles the collusive actions taken by Defendants to protect their control of the stock lending market, and their concerted effort to drive SL-x (and other similar companies) out of business.  It also reveals that Defendants reached a collusive agreement not to "break rank" and do business with SL-x or other trading platforms until the "EquiLend banks" determined, collectively, whether the platform would be allowed to survive.  This collective agreement is the very definition of a group boycott and is a *per se* violation of the antitrust laws.

10.     In addition, an SL-x competitor has come forward alleging that it too was the victim of a conspiracy by Defendants.  In another action brought in this Court captioned *QS Holdco Inc. v. Bank of America Corporation, et al.*, Case No 18 Civ. 824 (RJS), the beneficial owner of AQS – a competitor of SL-x – has come forward with facts concerning Defendants' collusive and illegal efforts to put that company out of business as well.

11.     On September 27, 2018 the *Iowa* Court issued a 93-page decision denying Defendants' motions to dismiss.  The decision included the following determinations:

> a.     "[T]he Amended [class action] Complaint ["AC"] proffers several allegations to support an inference of counter-profit behavior. In or about August 2011, Palamon Capital Partners and SL-x jointly proposed to acquire EquiLend at a price that would have yielded a profit for all parties. (AC ¶ 314).  The EquiLend Board refused to engage or negotiate the offer. (*Id*.). And in late 2014 or 2015, the tables were turned: **"[T]he Prime**

**Broker Defendants directed EquiLend to purchase [SL-x and AQS] to complete the elimination of them as competitors.**"  (emphasis added).

    b.  It is also not facially implausible that a small subset of prime brokers could bring about an actionable conspiracy, because the six named Prime Broker Defendants allegedly controlled between 76% and 80% of the market share in the stock loan market, and used that overall clout in the market to discourage others from investing in, or patronizing, AQS, SL-x, and Data Explorers.

    c.  The Court agreed with the class action plaintiffs' allegation that "EquiLend's joint venture status was a smokescreen behind which the Prime Broker Defendants could operate."

12.    On November 1, 2018, non-party SL-x IP S.á.r.l filed a complaint against Defendants containing substantially identical allegations to those alleged here.  That complaint has been challenged by Defendants, who claim that Plaintiffs are the parties who must assert any claims arising from Defendants' illegal antitrust conspiracy.

13.    Although Defendants' challenge is meritless, Plaintiffs bring this action in the alternative to preserve their right to recover against Defendants should they be deemed the proper parties to bring this action.

**<u>PARTIES</u>**

*Plaintiffs*

14.    Plaintiffs are all direct or indirect subsidiaries of non-party SL-x IP S.á.r.l., a Luxemburg corporation.  SL-x IP S.á.r.l. is a holding company that operated the SL-x business

4

through Plaintiffs and continued their business following the dissolution of Plaintiffs. Plaintiffs

have since been restored to active status in accordance with the laws of the relevant jurisdictions.

15.     Plaintiff SL-x Trading Europe Limited, is a United Kingdom corporation and

subsidiary of SL-x IP S.á.r.l.

16.     Plaintiff SL-x Technology UK Limited, is a United Kingdom corporation and

subsidiary of SL-x IP S.á.r.l.

17.     Plaintiff SL-x Technology USA LLC is a Delaware corporation and subsidiary of

SL-x IP S.á.r.l.

18.     Plaintiff SL-x Trading USA LLC, is a Delaware corporation and subsidiary of

SL-x IP S.á.r.l.

***Bank of America and Related Defendants***

19.     Defendant Bank of America Corporation ("BAC") is a Delaware corporation with

its principal place of business in Charlotte, North Carolina.

20.     Prior to BAC's 2009 acquisition of Merrill Lynch & Co., BAC offered prime

brokerage services through its subsidiary Banc of America Securities LLC, a Delaware limited

liability company with its principal place of business in New York, New York. Banc of America

Securities LLC merged into Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated,

effective November 1, 2010.

21.     On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc. and its subsidiaries.

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a Delaware

corporation with its principal place of business in New York, New York. It is a wholly-owned

subsidiary of BAC. MLPFS is registered as a broker-dealer with the U.S. Securities and

Exchange Commission ("SEC"), and is a clearing Member of the Options Clearing Corporation

5

("OCC"), a U.S.-based central counterparty clearinghouse and the world's largest derivatives clearing organization.

22.     Defendant Merrill Lynch Professional Clearing Corp. ("MLPCC") is a Delaware corporation, with its principal place of business in New York, New York.  MLPCC is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

23.     Defendant Merrill Lynch L.P. Holdings, Inc. ("MLLPH") is a Delaware corporation with its principal place of business in New York, New York.  It is a subsidiary of BAC.  MLLPH is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

24.     As used herein, the term "Bank of America" includes Defendants BAC, MLPFS, MLPCC, MLLPH, and their parents, subsidiaries, and affiliates (including Banc of America Securities LLC).  The Bank of America entities operate under common corporate control and coordinate their business activities.  During the relevant time period, Bank of America agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets.  Bank of America was a co-owner of EquiLend and Bank of America employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.  Bank of America employees served on the OCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on the Depository Trust Clearing Corporation's ("DTCC") Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

25.     Bank of America regularly transacts business in and has substantial contacts with New York, New York.  Indeed, the "Bank of America Tower," one of the largest office buildings on Sixth Avenue, holds a significant portion of Bank of America's corporate offices.  According to BAC's website, it has at least 50 financial centers or ATMs in New York, New York.  BAC also has many direct and indirect subsidiaries in New York, New York, and offered prime

brokerage services through those subsidiaries in New York, New York, during the relevant period. As discussed above, MLLPH, MLPCC, and MLPFS each have their principal place of business in New York, New York.

***Credit Suisse and Related Defendants***

26.     Defendant Credit Suisse Group AG ("CSG") is a Swiss corporation with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG ("CS") is a Swiss corporation with its principal place of business in Zurich, Switzerland. It is a wholly-owned subsidiary of CSG.

27.     Defendant Credit Suisse Securities (USA) LLC ("CSSUS") is a Delaware corporation, with its principal place of business in New York, New York. CSSUS is a wholly-owned subsidiary of CS, and thus ultimately of CSG. CSSUS is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

28.     Defendant Credit Suisse Prime Securities Services (USA) LLC ("CSPSS") is a Delaware limited liability company with its principal place of business in New York, New York. CSPSS is registered as a broker-dealer with the SEC.

29.     Defendant Credit Suisse First Boston Next Fund, Inc. ("CSFBNF") is a Delaware corporation with its principal place of business in New York, New York. It is a wholly-owned subsidiary of CS, and thus ultimately of CSG. CSFBNF is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

30.     As used herein, the term "Credit Suisse" includes Defendants CSG, CS, CSSUS, CSPSS, CSFBNF, and their parents, subsidiaries, and affiliates. The Credit Suisse entities operate under common corporate control and coordinate their business activities. Credit Suisse agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets.

During the relevant time period, Credit Suisse was a co-owner of EquiLend and Credit Suisse employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.  In addition, CS was engaged in discussions and signed a non-disclosure agreement with SL-x prior to Defendants' implementation of the boycott.

31.     Credit Suisse regularly transacts business in and has substantial contacts with New York, New York.  Indeed, Credit Suisse's main offices in the Americas are located in a building on Madison Avenue.  CS is registered to do business in New York, has direct and indirect subsidiaries in New York, New York, and in 2016, all 105 of CS's U.S.-based employees were located in New York, New York.  As discussed above, CSSUS, CSPSS, and CSFBNF each have their principal place of business in New York, New York.

***Goldman Sachs and Related Defendants***

32.     Defendant the Goldman Sachs Group, Inc. ("GSG") is a Delaware corporation with its principal place of business in New York, New York.  GSG is a direct part owner of EquiLend through Defendant EquiLend Holdings LLC.

33.     Defendant Goldman Sachs & Co. LLC ("GSC") is a Delaware corporation with its principal place of business in New York, New York.  GSC is a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

34.     Defendant Goldman Sachs Execution & Clearing, L.P. ("GSEC") is a Utah Limited Partnership with its principal place of business in New York, New York.  GSEC is or was until recently a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC and engaged in prime brokerage services in the United States before transferring its brokerage services to GSC in 2016.

8

35.     As used herein, the term "Goldman Sachs" includes Defendants GSG, GSC, GSEC, and their parents, subsidiaries, and affiliates.  The Goldman Sachs entities operate under common corporate control and coordinate their business activities.  During the relevant time period, Goldman Sachs, itself and through its affiliate agents, directly engaged in securities lending transactions.  Goldman Sachs agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets.  During the relevant time period, Goldman Sachs was a co-owner of EquiLend and Goldman Sachs employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.  Goldman Sachs employees served on the OCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

36.     Goldman Sachs regularly transacts business in and has substantial contacts with New York, New York.  The executive offices of Goldman Sachs are located in an office building on West Street.  GSG, GSC, and GSEC each have their principal place of business in New York, New York.  GSC and GSEC engaged in stock lending transactions in New York, New York during the relevant period.  In addition, GSG also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

*JP Morgan and Related Defendants*

37.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware corporation with its principal place of business in New York, New York.

38.     Defendant J.P. Morgan Securities LLC ("JPMS") (formerly known as "J.P. Morgan Securities Inc.") is a Delaware limited liability company with its principal place of business in New York, New York.  JPMS is registered as a broker-dealer with the SEC, and is a

9

clearing Member of the OCC.  JPMS is also the successor in interest to J.P. Morgan Clearing Corp., itself a successor to Bear Stearns Securities Corp.  Both J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp. were engaged in prime brokerage services in the United States and were part owners of EquiLend through Defendant EquiLend Holdings LLC. J.P. Morgan Clearing Corp. merged with JPMS in 2016.

39.     Defendant J.P. Morgan Prime, Inc. ("JPMP") is a Delaware corporation with its principal place of business in New York, New York.  JPMP is a wholly-owned subsidiary of JPMS, and thus ultimately of JPMC.  It is registered as a broker-dealer with the SEC and provides prime brokerage services in the United States.

40.     Defendant J.P. Morgan Institutional Investments Inc. ("JPMII") is a Delaware corporation with its principal place of business in New York, New York.  JMPII is registered as a broker-dealer with the SEC.

41.     Defendant J.P. Morgan Strategic Securities Lending Corp. ("JPMSSL") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  JPMSSL is a subsidiary of JPMC and is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

42.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB"), a wholly-owned subsidiary of JPMC, is a federally chartered national banking association with its principal place of business in New York, New York.  JPMCB was formerly a part owner of EquiLend through Defendant EquiLend Holdings LLC.

43.     As used herein, the term "JP Morgan" includes Defendants JPMC, JPMS, JPMP, JPMII, JPMSSL, JPMCB, and their parents, subsidiaries, and affiliates (including J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp.).  The J.P. Morgan entities operate under

common corporate control and coordinate their business activities. JP Morgan agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets. During the relevant time period, JP Morgan was a co-owner of EquiLend and JP Morgan employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017. JP Morgan employees served on the OCC's Board of Directors in 2009 and on DTCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

44.     JP Morgan regularly transacts business in and has substantial contacts with New York, New York. Indeed, JP Morgan's corporate headquarters is an office building on Park Avenue. As discussed above, JPMC, JPMS, JPMP, MPJII, and JPMCB each have their principal place of business in New York, New York. JPMS, JPMP, and JPMII engaged in stock lending transactions in New York during the relevant period. In addition, JPMC, JPMSSL, and JPMCB also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

***Morgan Stanley and Related Defendants***

45.     Defendant Morgan Stanley ("MS") is a Delaware corporation with its principal place of business in New York, New York.

46.     Defendant Morgan Stanley Capital Management, LLC ("MSCM") is a Delaware limited liability company with its principal place of business in New York, New York. MSCM is a wholly-owned subsidiary of MS.

47.     Defendant Morgan Stanley & Co. LLC ("MS&C") (formerly known as Morgan Stanley & Co., Inc.) is a Delaware limited liability company with its principal place of business in New York, New York. MS&C is a registered broker-dealer with the SEC and a clearing Member of the OCC.

11

48.     Defendant Prime Dealer Services Corp. ("PDSC") is a Delaware corporation with its principal place of business in New York, New York.  PDSC is a wholly-owned subsidiary of MS&C, and thus ultimately of MS.  It is also a registered broker-dealer with the SEC. PDSC engages in securities borrowing and lending in support of MS&C's prime brokerage services.

49.     Defendant Strategic Investments I, Inc. ("SII"), a subsidiary of MS, is a Delaware corporation, with its principal place of business in New York, New York.  SSI is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

50.     Defendant Morgan Stanley Distribution, Inc. ("MSDI") is a Pennsylvania corporation with its principal place of business in New York, New York.  MSDI is registered with as a broker-dealer with the SEC.

51.     As used herein, the term "Morgan Stanley" includes Defendants MS, MSCM, MS&C, PDSC, SII, MSDI, and their parents, subsidiaries, and affiliates.  The Morgan Stanley entities operate under common corporate control and coordinate their business activities. Morgan Stanley agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets.  During the relevant time period, Morgan Stanley was a co-owner of EquiLend and Morgan Stanley employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.  Morgan Stanley employees served on the OCC's Board of Directors in 2010, 2011, 2012, 2013, and 2014 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

52.     Morgan Stanley regularly transacts business in and has substantial contacts with New York, New York.  Indeed, Morgan Stanley's global headquarters is located in an office building on Broadway.  As discussed above, MS, MSCM, MS&C, PDSC, SII, and MSDI each have their principal place of business in New York, New York.  MS, MS&C, PDSC, and MSDI

engaged in stock lending transactions in New York, New York during the relevant period.  In addition, MSCM and SII also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

***UBS and Related Defendants***

53.    Defendant UBS Group AG ("UBSG") is a Swiss corporation with its principal places of business in Basel and Zurich, Switzerland.  Defendant UBS AG is a Swiss corporation with its principal places of business in Basel and Zurich, Switzerland.  It is a wholly-owned subsidiary of UBSG.

54.    Defendant UBS Americas Inc. ("UBSA"), is a Delaware corporation with its principal place of business in Stamford, Connecticut.  UBSA is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

55.    Defendant UBS Securities LLC ("UBSS") is a Delaware limited liability company with its principal place of business in New York, New York.  It is a subsidiary of UBSA, and thus ultimately of UBSG.  UBSS is a registered broker-dealer with the SEC and a clearing Member of the OCC.

56.    Defendant UBS Financial Services Inc. ("UBSFS") is a Delaware corporation with its principal place of business in Weehawken, New Jersey.  UBSFS is a registered broker-dealer with the SEC and a clearing Member of the OCC.

57.    Defendant UBS Investment Bank ("UBSIB") is an English corporation with its principal place of business in London, England.  UBSIB, a subsidiary of UBS AG, provides prime brokerage services.  It was formerly known as UBS Warburg until it changed its name in 2003.

58.     Defendant UBS Asset Management (US) Inc. ("UBSAM") is a Delaware corporation with its principal place of business in New York, New York.  UBSAM is a registered broker-dealer with the SEC.

59.     Defendant UBS Fund Services (USA) LLC ("UBSFSU") is a Delaware corporation with its principal place of business in Hartford, Connecticut.  UBSFSU is a registered broker-dealer with the SEC.

60.     As used herein, the term "UBS" includes Defendants UBSG, UBS AG, UBSA, UBSS, UBSFS, UBSIB, UBSAM, UBSFSU, and their parents, subsidiaries, and affiliates.  The UBS entities operate under common corporate control and coordinate their business activities.  UBS agreed with the other Defendants to boycott SL-x and ultimately to force a sale of its assets.  During the relevant time period, UBS was a co-owner of EquiLend and UBS employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.  UBS employees served on DTCC's Board of Directors in 2009.  Moreover, UBS AG and UBSIB were engaged in discussions and signed non-disclosure agreements with SL-x prior to Defendants' implementation of the boycott.

61.     UBS regularly transacts business in and has substantial contacts with New York, New York.  For instance, UBS AG has a major branch office, which serves as one of its U.S. headquarters, in New York, New York.  This "flagship" office employs over 150 employees, and derives substantial revenue for UBS, in New York, New York.  UBSA, UBSS, UBSFS, and UBSAM are each registered to do business in New York, and UBSIB maintains an office in New York, New York.  As discussed above, UBSS and UBSAM both have their principal place of business in New York, New York.  UBSS, UBSFS, UBSAM, and UBSFSU engaged in stock lending transactions in New York, New York during the relevant period.  In addition, UBSG,

UBS AG, UBSA, and UBSIB also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

***EquiLend and Related Defendants***

62.     Defendant EquiLend Holdings LLC is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant EquiLend LLC is a Delaware limited liability company with its principal place of business in New York, New York.  It is a subsidiary of EquiLend Holdings LLC.  Defendant EquiLend Europe Limited is a private limited company incorporated in England and Wales, with its principal place of business in London, United Kingdom.  It is a subsidiary of EquiLend Holdings LLC.

63.     As used herein, "EquiLend" includes Defendants EquiLend Holdings LLC, EquiLend LLC, EquiLend Europe Limited and their parents, subsidiaries, and affiliates.  The EquiLend entities operate under common corporate control and coordinate their business activities.  EquiLend is owned in part by Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.  As explained below, EquiLend conspired with the other Defendants to prevent the emergence of efficient electronic trading systems in stock lending markets.

64.     EquiLend regularly transacts business in and has substantial contacts with New York, New York. For instance, EquiLend Europe Limited has multiple officers and directors based in New York.  As discussed above, EquiLend Holding LLC and EquiLend LLC both have their principal place of business in New York, New York and are registered to do business in New York.

## JURISDICTION AND VENUE

65.    The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C.

§§ 1332(a)(1) and 1337(a), as it involves claims arising under federal antitrust statutes,

specifically Section 1 of the Sherman Act, 15 U.S.C. § 1 (expressly prohibiting Defendants'

conduct) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (providing a private

right of action for those injured by violations of the antitrust laws).

66.    The Court has supplemental jurisdiction over the claims arising from state law

pursuant to 28 U.S.C. § 1367.

67.    The Court has jurisdiction over Defendants pursuant to the nationwide contacts

test provided for by 15 U.S.C. § 22.  Most Defendants are subject to personal jurisdiction in the

United States because they were formed in or have their principal places of business in the

United States.  The other Defendants are members of the conspiracy and are subject to personal

jurisdiction in the United States because the conspiracy was directed at and carried out in

substantial part in the United States.  For example, Defendants directly conspired through and

with EquiLend, whose principal place of business is in New York City.  They also met and

conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including

at private dinners in New York City.

68.    Defendants are also subject to personal jurisdiction because each, either directly

or through its respective agents or affiliates, transacted business throughout the United States,

including in this District, that was directly related to the claims at issue in this action.

Specifically, the stock loans at issue were regularly traded through the desks of Defendants

located in New York City.  Defendants are also subject to personal jurisdiction here because their

affiliates conducted stock lending in the United States as their agents, and if they did not, the Defendants would have to have made those trades themselves.

69.     Additionally, the Court has jurisdiction over all Defendants who have their principal place of business in New York State.

70.     The Court also has jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302, because Defendants transact business in New York State; Defendants had substantial contacts with New York State; Defendants committed overt acts in furtherance of Defendants' conspiracy in New York State; each Defendant is an agent of the other Defendants; Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York State; and Defendants own, use, or possess real property in New York State.

71.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c), and (d) because during the relevant period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## FACTUAL ALLEGATIONS

## I.     THE RELEVANT MARKET

### *A.     Stock Lending Generally*

72.     To understand SL-x and the innovative product that it developed, it is first necessary to know a bit about the stock loan market and how it operates.

73.     A stock loan is a financial transaction in which a borrower takes temporary title to shares of stock.  In exchange for receiving temporary ownership of the stock, the borrower pays a fee and posts collateral sufficient to cover the value of the borrowed stock.

74.     There are several common uses for stock loans.  For example, stock borrowers often take out stock loans so that they can execute a so-called "short sale."  In a short sale, an individual borrows shares of a stock and then sells them on the market.  If the stock price subsequently declines, he or she can then repurchase the borrowed shares for a lower price and then return them to the original owner, reaping a profit.  If the price appreciates, he or she is forced to repurchase the stock for more than it was sold for, taking a loss.

75.     Short sales may be used to invest in the idea that a stock will decline in value.  Or they may form a single piece of a larger trading strategy, such as a convertible bond arbitrage or an index arbitrage.  In those transactions, an individual buys one side of a pair of linked securities, such as a stock and a convertible note, or an index and its component stocks, and sells the other short.  If the two linked securities have divergent values, the individual can profit by simultaneously buying the undervalued security and selling the overvalued one short.

76.     In addition to the benefits to borrowers, stock loans are used by stockholders to finance investments, provide short term liquidity, or increase the return on stock assets.  For example, a mutual fund that holds a significant stock portfolio may loan stock in exchange for cash collateral, which it can then invest in other assets during the lending period.  This increases the flexibility and potential return on the stock investments in the portfolio.

77.     There are also forms of tax arbitrage that rely upon stock lending.  Some jurisdictions, particularly within the European Union, have tax credits that are not available to all investors.  A dividend paying stock may be lent so that it can be sold to a tax advantaged investor

at a price that reflects this tax savings.  By doing so, stock holders may be able to receive the economic benefit of tax savings that would not otherwise be available.

78.     In addition to enabling trading strategies, stock loans are also used to provide settlement coverage for entities that buy and sell the same stock – ensuring that a counterparty's failure to deliver stock pursuant to a trade does not lead to a chain of failed trades with other parties.  This is particularly important for market makers that provide liquidity in small capitalization stocks, where a failure to receive a large purchase might otherwise lead to multiple failed sales.

79.     Stock loans are typically "open," meaning that the loan has no specific duration. Either party can terminate the loan, at which time the shares and collateral are returned to their original owners, minus any fees paid.

### B.     The Stock Lending Market

80.     Because stock lending enables many extremely common practices in the financial markets, over a trillion dollars of securities are lent every year.

81.     Yet despite the prevalence of stock loans, and their importance to the smooth operation of the financial markets, the mechanisms by which stock loans are executed are antiquated, having changed little in decades.

82.     The stock loan market is an "over-the-counter" ("OTC") market.  This means that there is no central marketplace or exchange by which borrowers and sellers can obtain pricing data, compare offers and execute transactions directly.  Instead, stock loan transactions are generally consummated through entrenched financial intermediaries, who use their position to extract tolls from both lenders and borrowers.

83.     These counterparties include "Agent Lenders" and "Broker-Dealers."

### C.      *Agent Lenders*

84.     Agent Lenders, sometimes called "Agent Banks" or "Custodial Lenders" act as financial intermediaries for parties who are willing to lend stock.  In many cases, Agent Lenders are also the custodial entities that manage the underlying stock on behalf of its beneficial owner or owners.  Examples of prominent Agent Lenders include State Street, BNY Mellon, and Northern Trust.

85.     Stock lending by Agent Lenders is often done as part of a broader mutual fund investment strategy.  For example, Vanguard and Blackrock, two of the largest fund managers in the world, both lend out stock in their mutual fund portfolios and return the proceeds of the lending, minus their fees, to the funds.[1]  Similarly, the fees earned by pension funds for stock lending increase the returns to the pensioners.  This practice increases the returns to the fund investors.

### D.      *Broker-Dealers*

86.     Broker-Dealers, sometimes simply referred to as "Securities Dealers," act as financial intermediaries on behalf of parties who seek to borrow stock.  Examples of prominent Broker-Dealers include Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.

87.     Broker-Dealers may act as market makers or may borrow pursuant to specific instructions from their clients.  When borrowing on behalf of individual clients, Broker-Dealers quote their clients a price to borrow specific securities, but do not detail the portion of that price

---

[1]     *See* https://advisors.vanguard.com/iwe/pdf/Sec_lending.pdf (description of Vanguard securities lending policies) and https://www.blackrock.com/investing/literature/brochure/us-retail-securities-lending-brochure.pdf (description of Blackrock Securities Lending policies).

that the Broker-Dealer keeps for itself.  As such, Broker-Dealers are often able to charge earn

enormous profits on stock loan transactions without raising the ire of their clients.

### E.    Current Market Practice

88.    With no central marketplace to connect lenders and borrowers, stock lending

transactions today are arranged through direct, bilateral communications between Agent Lenders

and Broker-Dealers.  These negotiations may take place over the phone or through electronic

messaging systems such as Bloomberg.  Because matching between potential lenders and

borrowers is conducted in an opaque, ad-hoc fashion, Agent Lenders and Broker-Dealers may

engage in a large amount of price comparison between potential counterparties or virtually none,

at their discretion.

89.    While the economics of stock loan transactions are negotiated on a transaction by

transaction basis, the legal documentation underlying the agreements is highly standardized.

Each stock loan uses a Master Securities Lending Agreement ("MSLA"), which provides

uniformity across transactions and establishes the legal rights and obligations of the parties to the

transaction. The Defendants have established MSLA agreements with each of their Agent Lender

counterparts and borrower clients.

90.    A typical transaction might proceed as follows.  Assume that Hedge Fund Alpha

wishes to borrow 10,000 shares of stock in IBM.  If the hedge fund wanted to buy the shares

outright, it could go to any number of online exchanges, where it could see up to the minute data

concerning the recent purchases of IBM and the bid/ask spread quoted by potential

counterparties.  But because no such marketplace exists for stock borrowing, it cannot simply

place an order online to obtain a fair, market-driven price to borrow a stock.

21

91. Instead, Hedge Fund Alpha contacts Broker-Dealer Beta. This request may be via its electronic order management system or via telephone. Hedge Fund Alpha asks for a quote to borrow 10,000 shares of IBM. Broker-Dealer Beta locates the stock and quotes a fee for the transaction. The fee can take the form of an outright charge to borrow the stock. It can also take the form of a discount on the interest paid on the collateral pledged to secure the stock. In either case, the fee incorporates both the amount to be paid to the ultimate lender and the commissions charged by Broker-Dealer Beta.

92. Hedge Fund Alpha is not told what portion of the fee to borrow is paid to each participant nor what other Broker-Dealers would charge. Hedge Fund Alpha could call other Broker-Dealers to compare prices, but this is difficult, as contacting multiple Broker-Dealers is time-consuming and the prices are subject to immediate change. So the hedge fund agrees to Broker-Dealer Beta's fee and to transfer the necessary collateral for the loan.

93. Broker-Dealer Beta then looks for a counterparty to lend the stock. But while Broker-Dealer Beta has better information than Hedge Fund Alpha, it also lacks effective tools to efficiently execute the transaction. It cannot simply post a request for offers from multiple Agent Lenders at once. Instead, Broker-Dealer Beta has one of two options.

94. Broker-Dealer Beta could look at electronic "bulletin boards" that post the stock inventory of Agent Lenders and the prices that they will charge to lend the stock. One of these bulletin boards is operated by EquiLend and incorporates inventory from multiple Agent Lenders. Other Agent Lenders, such as State Street or BNY Mellon operate their own listings. In either case, the Broker-Dealer has no ability to bid for a price. It can either accept the price listed or go somewhere else.

22

95.     Alternatively, the Broker-Dealer could contact one or more Agent Lenders individually, either by telephone or electronic messaging, to see whether the stock is available and the price that the Agent Lender will accept.  This is cumbersome and time consuming, particularly for stock lending desks that must process many orders from many clients daily.

96.     Once Broker-Dealer Beta finds an acceptable Agent Lender, say Agent Lender Gamma, they reach agreement on the economics and execute the transaction.  Broker-Dealer Beta transfers the collateral to Agent Lender Gamma, along with the Agent Lender's share of the fee.  Agent Lender Gamma contacts the appropriate Central Securities Depository ("CSD") to inform it that ownership of the stock should be transferred to Hedge Fund Alpha.

97.     The original owner of the stock, Stockholder Delta, may not even be aware that the transaction has taken place.  The agreement between Stockholder Delta and Agent Lender Gamma, will determine how much of the fee paid to Agent Lender Gamma, if any, is ultimately returned to the stockholder.

**II.     SL-X 's PRODUCT**

98.     The process described above is slow, inefficient, and labor intensive compared to matchmaking in other financial markets.  Recognizing these failings, SL-x was founded by a group of electronic trading veterans who hoped to improve the user experience for all market participants and bring the modern processes and workflows used by other traders to the stock lending market.  The patented software SL-x developed offered enormous advantages over existing tools and could have revolutionized the stock lending to the benefit of all marketplace participants.

99.     SL-x created an online platform where Broker-Dealers and Agent Lenders could post bids and offers for potential stock loan transactions.  The platform provided for a high

degree of both automation and flexibility.  Users of SL-x could permit the system to "match" them automatically with a counterparty that met their price and quantity criteria.  Alternatively, users could use the system to search for potential counterparties that met certain criteria and contact one or more of them directly to negotiate terms.

100.    The pricing data generated by transactions across SL-x was displayed to all users in real time.  For example, if an SL-x user wanted to borrow shares of General Electric or Walmart, he or she could first look at the "ticker" to see the prices that other users had paid for similar amounts of each stock.  By displaying this real time data, SL-x provided its users with vastly more information concerning market pricing for stock loans than was previously available, allowing them to better price prospective loans.

101.    The SL-x system also offered a variety of flexible communication options.  In addition to one-on-one messaging, users could create groups to facilitate multiparty communication.  For example, a Broker-Dealer that wanted to compare multiple bids could contact several Agent Lenders simultaneously to see which one offered the best pricing terms.  It might even create different contact groups based on past dealings, reaching out to certain groups for certain types of transactions and other groups for other transactions.  Because the system processed all communication, it made it easy to negotiate with multiple parties at the same time.

102.    This flexibility also permitted parties to conduct transactions anonymously or semi-anonymously.  For example, an Agent Lender could solicit quotes from Broker-Dealers without revealing its name and then, if it so chose, disclose its identity at some point later in the negotiations.

103.    Once the parties agreed on terms for a stock loan, SL-x's software interfaced directly with the backend systems for the Broker-Dealer and Agent Lender, allowing transactions

to be executed swiftly without the need to leave the program or otherwise disrupt ongoing workflow.  This allowed users to handle more stock loan transactions vastly more efficiently than existing systems.

104.     SL-x's software was also designed to streamline compliance and auditing.  Every keystroke or mouse click by an SL-x user was logged.  This permitted internal compliance departments to review every step of every transaction, including all communications with potential counterparties.  This stood in dramatic contrast to existing practice, where reviewing a transaction might not be possible.

105.     But beyond the raw functionality and modern user interface of SL-x's software, it also offered a huge economic advantage involving lending of European stock.  SL-x entered into an agreement with Eurex Clearing ("Eurex"), a central counterparty based in Germany, to provide central clearing for stock loan transactions executed on its system that involved companies based in France, Germany, Switzerland, Belgium, or the Netherlands.

106.     Central clearing is a service where a company, generally called a "clearinghouse," "Central Counterparty" or "CCP" agrees to step in as the counterparty for otherwise failed transactions in exchange for a small fee.  It dramatically reduces counterparty risk and enables market participants to trade without worry about the creditworthiness or integrity of other parties to a deal.

107.     Through its contract with SL-x, Eurex was offering to backup any transaction executed on the SL-x platform in the five countries above.  For example, if an SL-x user borrowed the stock of France Telecom on the platform, it would know that the stock would be delivered by Eurex even if the original lender failed to perform.

108.     This elimination of counterparty risk was particularly significant due to the passage of Dodd Frank and the Basel III regulations that were in the process of being implemented during the development of SL-x.  Dodd Frank reduced or eliminated internal "netting" of transactions from various counterparties that banks had used to claim that stock lending transactions were risk neutral.  And Basel III altered Value at Risk ("VaR") modelling in a fashion that increased the risk profile of stock lending and consequently the capital required to lawfully operate a stock lending desk at a regulated bank.

109.     But even under this new regulatory regime, centrally cleared transactions were treated as extraordinarily low risk.  As such, by providing access to central clearing, SL-x could reduce the capital cost to a stock lending operation by up to 98%.  This huge capital savings could then be applied to other areas of a bank's business or to expanding the stock loan department by up to 50-fold using the same capital.

110.     In addition to its arrangement with Eurex, SL-x entered into discussions with several clearing providers in the United States, including The Depository Trust & Clearing Corporation ("DTCC") and The Options Clearing Corporation ("OCC"), to provide similar services with respect to American stock.

## III.     DEFENDANTS INITIALLY PRAISE AND THEN LATER UNDERMINE SL-X AND ITS PRODUCT

### A.     SL-x and Its Sales Efforts

111.     SL-x was founded in 2010 and the founders included several former employees of SecFinex, a European electronic trading marketplace based in London.

112.     SecFinex, a subsidiary of NYSE Euronext, was an online bulletin board system where Agent Lenders could post European stock inventory and borrowing prices.  It operated in a manner similar to the bulletin board currently operated by EquiLend.  However, in 2008-2009,

SecFinex introduced central clearing to the stock loan transactions processed through its system, relying upon LCH.Clearnet to act as the CCP.

113.    While SecFinex was a substantial innovation over existing stock lending practices, it still had significant limitations and the tools that it offered Brokers and Agent Lenders to negotiate and consummate transactions were limited.

114.    From the very beginning SL-x set out to learn from the experience of SecFinex and create an online, centrally cleared marketplace for stock lending transactions.  The founders of SL-x drew form decades of experience in both financial technology and central counterparty platforms.  Indeed, SecFinex was one of the first companies to attempt to use technology to streamline stock lending in Europe.

115.    The prospect of bringing modern technology to bear on the stock lending market attracted significant interest.  In 2011, Palamon Capital Partners ("Palamon") agreed to provide funding to give SL-x the resources necessary create and launch its product.  Experienced software developers were hired, and work began immediately on the SL-x platform.  Over the course of the next few years, SL-x later obtained patents for groundbreaking technology incorporated into its software.

116.    While development was still underway, SL-x embarked on a campaign to introduce its product to the Agent Lenders and Broker-Dealers who were expected to be among the first customers.  This effort was led by Peter Fenichel, SL-x's Chief Executive Officers, along with Robert Reynolds, the head of Sales, and Hank Mlynarski, SL-x's Chief Operating Officer.  Collectively they met, often multiple times, with every major Agent Lender or Broker-Dealer operating in the United States or Europe.  In addition, as described below, SL-x met with EquiLend concerning the prospect of a potential acquisition or joint venture.

117.    Because of the strength of its product, SL-x received enormous amounts of initial interest from Defendants, more than one of which contemplated investing in the company.  But instead of working with SL-x, Defendants reached an agreement to collectively boycott SL-x so that it could not threaten the control Defendants exercise over the stock lending industry.

118.    The contact between SL-x and Defendants can be summarized as follows.

### B.    Contact with EquiLend

119.    EquiLend is a company owned by Broker-Dealers and Agent Lenders, including the Defendants.

120.    EquiLend was originally created to provide post trade reconciliation and billing services for stock loan transactions.  For example, EquiLend does "contract compare" of Broker-Dealers and Agent Lenders records with respect to individual stock loans to verify that both parties have accurately reflected the deal reached.  Where the records match, EquiLend does billing reconciliation to ensure that the correct fees are paid between the parties.

121.    EquiLend also operates an electronic bulletin board where Agent Lenders can post their stock inventory together with a fixed price to borrow each stock.  This bulletin board also incorporates an "auto-borrow" tool that permits Broker-Dealers to electronically execute stock lending transactions at the prices dictated by the Agent Lenders.  However, EquiLend does not permit "bids" and "asks" to be exchanged by prospective counterparties and does not provide the tools necessary for potential counterparties to negotiate and execute transactions in real time.

122.    Recognizing the limitations of EquiLend's systems, SL-x contemplated partnering with EquiLend to improve them.  On August 1, 2011, SL-x sent a letter to Jeffery Benner, then the Chairman of EquiLend.  The letter proposed that SL-x enter into an agreement with EquiLend to modernize and improve its platform by incorporating SL-x's new technology.

28

123.    In conversations with Jeffery Benner and Brian Lamb, the Chief Executive Officer of EquiLend, SL-x proposed that SL-x, with assistance from Palamon, could purchase EquiLend outright from the banks that owned it.  The banks would be guaranteed a healthy profit from the sale and SL-x would be able to leverage the EquiLend consortium to create its modern and efficient marketplace.

124.    On September 21, 2011, Lamb responded to SL-x's August 1 letter by email, rejecting the offer.

125.    In its rejection, EquiLend not only declined SL-x's proposal, it rejected any further efforts at negotiation.  In essence it stated that EquiLend was not available for sale at any price, no matter how beneficial to its shareholders.

126.    Faced with this rejection, SL-x continued to shop its product to individual Broker-Dealers and Agent Lenders as a potential competitor to EquiLend

### C.    Contact with Bank of America

127.    In July of 2014, SL-x representatives met with Bank of America employees, including Denis Manelski, a Managing Director and Co-Head of North American Rates Trading, Rajeev Patel, a Managing Director and Global Head of Markets Financing, and Robert Genkinger, a Managing Director.

128.    At the meeting, Bank of America representatives stated that the company would conduct a "firm-wide review" of SL-x with strategic management in New York and London and that it was interested in considering innovative solutions like SL-x.

129.    Bank of America's employees cautioned however, that there was an "internal debate" about how best to access central clearing and that there were concerns about how this would affect Bank of America's relationship with EquiLend.

130.     Because of concerns that using SL-x would jeopardize Bank of America's relationship with EquiLend and the EquiLend board members, Bank of America never became an SL-x customer.

### D.     Contact with Credit Suisse

131.     On October 24, 2012, SL-x employees met in Zurich with Ralph Lehnis, the Managing Director of Securities Lending for Credit Suisse, Marco Bozzolan, the Director of Prime Services for Credit Suisse, and Carmen Beck and Lucas Brunner, each Directors of Securities Lending Trading for Credit Suisse.

132.     At the meeting the Credit Suisse employees expressed great interest in the SL-x platform and stated that Credit Suisse would pursue SL-x as a CCP solution in stock lending.

133.     On November 9, 2012, SL-x employees held another meeting in London with Frederick Nadd-Aubert, the Global Head of Securities Lending Strategy for Credit Suisse and Karl Bishti, Credit Suisse's Director of Prime Services.

134.     At the November meeting both Nadd-Aubert and Bishti expressed additional interest in the SL-x product and, in particular, the central clearing and capital savings that it could provide.

135.     Nadd-Aubert, a former EquiLend board member, also expressed deep dissatisfaction with the EquiLend product offerings and hope that SL-x's innovative technology could greatly improve the market.

136.     SL-x followed up with another meeting with Nadd-Aubert in December of 2012. Shortly thereafter, SL-x contacted Credit Suisse about holding demonstrations of SL-x's product and its capabilities.  The Credit Suisse representatives were very open to demonstrations and expressed interest in seeing firsthand what the product could do.

137.    SL-x provided demonstrations of the product and its capabilities for Credit Suisse employees in February, March, April, and May of 2013.  Nadd-Aubert and Bishti attended some of the demonstrations, and others were attended by Justin Carey, the head of Credit Suisse's stock loan desk, and Bill Gilchriest, a director in the New York office.  The demonstrations were very positively received.

138.    Indeed, at a meeting that took place on February 26, 2013, Bishti extolled the virtues of SL-x compared to the existing market tools and noted that he often wondered if, ten years in the future, market participants would laugh at the way that business had been conducted.

139.    At the meeting, Bishti warned however, that EquiLend was like "the mafia run by five crime families" and that SL-x should not underestimate it as a competitor.

140.    These warnings grew more serious in a meeting that took place on between SL-x employees and Bishti on July 19, 2013.  At that meeting, Bishti claimed that Credit Suisse had reversed its position and would only join after other large players – "the Big Boys" – committed to the platform.

141.    Bishti further warned that without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry.

142.    In the hope that this strange reversal could be undone, in the third quarter of 2013, SL-x employees met in New York with Paul Germain, the Managing Director and Global Head of Prime Services for Credit Suisse.  Germain was briefed about the product features of SL-x and the enormous potential for capital savings.

143.    Germain was very positive about the product and arranged another meeting in early 2014 between SL-x employees and Nadd-Aubert and Carey.  But despite this meeting, and others that took place in July of 2014, Credit Suisse never moved forward with SL-x.

144.     Indeed, in a subsequent call with Paul Germain, Germain admitted that despite a great deal of interest in the technology, Credit Suisse would be unable to become an SL-x customer and would be using EquiLend for the foreseeable future, regardless of the limitations of the product offering.

### E.     Contact with Goldman Sachs

145.     SL-x employees met with Brad Levy, Global Head of Goldman Sachs' Principal Strategic Investments Group, in the summer of 2011 to discuss the potential acquisition of Equilend.  Levy was very intrigued by the idea, stating that "this is something we should have done 18 months ago" in anticipation of Basel III capital rules.  Indeed, Levy even discussed the possibility of a Goldman Sachs investment in SL-x.

146.     However, others at Goldman Sachs moved quickly to kill the deal.  At a subsequent meeting between SL-x employees and William Conley, the Global Director of Securities Lending for Goldman Sachs, Conley made it clear that Goldman Sachs was not supportive of any alternative to EquiLend.

147.     SL-x personnel met privately with William Conley and others from Goldman Sachs. At the meeting, Mr. Conley was frank: If the Prime Broker Defendants were to allow a central trading platform with counterparty clearing, it would encourage smaller competitors, such as Jefferies, to enter the stock lending market and begin to compete with the Prime Broker Defendants for market share. This would not be a good development for the Prime Broker Defendants

148.     In a subsequent communication, Levy relayed that Conley had prevailed inside of Goldman Sachs and that use of SL-x was out of the question.

### F.    *Contact with JP Morgan*

149.    On November 8, 2012, SL-x employees met with Laura Allen, the Executive Director of Equity Finance Prime Brokerage for JP Morgan, along with Tobias Mogul, JP Morgan's Executive Director of Prime Brokerage, and Andrew Burpitt, a Vice President of Equity Finance Prime Brokerage for JP Morgan.

150.    The JP Morgan employees were very receptive to SL-x's product and described the poor job that EquiLend did in allowing Broker-Dealers to find counterparties.

151.    The auditability offered by SL-x was also an attractive feature for JP Morgan.  At the time, JP Morgan employees were booking stock lending transactions with essentially no audit trail, striking deals over Bloomberg messages or telephone calls.

152.    On March 28, 2013, SL-x employees met with Allen again, along with Rosie Allot, a JP Morgan employee responsible for Equity Finance Prime Brokerage.

153.    At the meeting Allen once again praised SL-x's platform and stated that it was her belief that all Broker-Dealers would benefit from using it.  She expressed hope that Agent Lenders would also follow suit.

154.    On May 9, 2013, SL-x employees met with John Shellard, the Managing Director of Trading Services for JP Morgan, along with Nick Davis, JP Morgan's Trading Manager and Harpreet Purwaha, a JP Morgan Product Manager.

155.    During the meeting SL-x employees demonstrated their product and its capabilities.  Shellard was complimentary about SL-x design and functionality, comparing it favorably to the offerings by EquiLend.

156.    In another meeting that same month, SL-x employees spoke to Carlos Hernandez a Managing Director and Global Head of Investor Services for JP Morgan, along with Michael

Kelleher, the Managing Director of Prime Brokerage for JP Morgan.  Kelleher was shown the SL-x production platform and, like Shellard and Allen, was very complimentary of the technology and what it could mean for JP Morgan's business.

157.    However, this favorable view changed dramatically in a subsequent meeting on August 7, 2013.  At that meeting between SL-x employees and Shellard, he stated that JP Morgan had had "internal" discussions concerning SL-x and had decided to "monitor market developments" and wait to see if others adopted SL-x before becoming a customer.

158.    But while claiming that these internal discussions had dictated JP Morgan's strategy, Shellard did admit that "there is general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend" and that JP Morgan participated in discussions with other banks about industry direction at the EquiLend meetings.

159.    Hoping to overturn this sudden change, SL-x's chairman, Robert DiFazio, met with Jamie Dimon, the Chairman, CEO and President of JP Morgan.  At the meeting, DiFazio informed Dimon about the significant capital savings that the SL-x platform could offer.  Dimon was pleased by the prospect of capital savings in the stock lending business and claimed that others at the bank would continue discussions with SL-x about becoming a customer.  He instructed SL-x to follow-up with Carlos Hernandez, JP Morgan's Head of Prime Brokerage.

160.    As a result of the meeting with Dimon, SL-x had further discussions with JP Morgan about the prospect of JP Morgan joining the SL-x platform, including a very positive meeting with Hernandez, and a meeting with Judy Polzer and B.J. Marcoullier in New York in early 2014.

161.    However, despite these discussions and others that followed in late 2014, JP Morgan never became an SL-x customer.

### G.     Contact with Morgan Stanley

162.    In March of 2013, an SL-x representative met with Tom Wipf, a senior Morgan Stanley banker, and Anthony Schiavo, the head of Morgan Stanley's stock lending desk.

163.    At the meeting Wipf was supportive of SL-x's product, particularly the central clearing aspect that would permit customers to reduce capital costs. And Schiavo also stated that if SL-x could produce an effective CCP model, Morgan Stanley would be interested.

164.    SL-x followed up with another meeting in early 2014, this time with Schiavo and Tejash Patel, an Executive Director at Morgan Stanley.

165.    At the meeting, both Patel and Schaivo were enthusiastic about the SL-x product and urged further discussions between the companies.

166.    But despite these early positive meetings, in July of 2014, Morgan Stanley's position changed markedly.  At two meetings with Wipf and Ed McAleer, another Morgan Stanley Managing Director, SL-x was told that Morgan Stanley would not go forward with SL-x and that any further development of a CCP solution would be done through EquiLend.

### H.     Contact with UBS

167.    On December 4, 2012, SL-x employees met with Casey Whymark, a Managing Director and Co-Head of Securities Lending and Financing for UBS.  Also at the meeting was Philipp Haller, an Executive Director of Trading Strategy and Development at UBS.

168.    At the meeting the UBS representatives agreed with the premise of SL-x and the need for a centrally cleared stock lending marketplace.  They expressed a desire to see the product that SL-x was building once it was available.

169.    On July 9, 2013, SL-x arranged for a product demonstration for Whymark and Haller.  They were so impressed by the technology that SL-x had developed that Whymark

expressed interest in becoming an "early partner" in SL-x and obtaining some form of "equity participation" in the business.

170.    On September 6, 2013, SL-x held another meeting with Whymark, and Laurent Issner, the Chief Operating Officers of Securities Lending & Financing for UBS.

171.    Whymark again stated that UBS was "impressed" by the SL-x platform and asked for additional details concerning the Eurex clearing agreement.  Whymark described UBS as eager to participate once the product was launched.

172.    However, despite this early enthusiasm, at a subsequent meeting on December 4, 2013, UBS changed its position.  Whymark told SL-x representatives that UBS was not prepared to commit to SL-x and that any agreement would need to be approved by James Buckland, the Global Head of Securities Lending for UBS and a member of the EquiLend Board.

173.    At an earlier meeting, that took place in London on September 26, 2013, Buckland had explicitly discussed the benefit of being "inside the club" of EquiLend member banks to effectuate market changes and suggested that any market transition towards an SL-x platform and central clearing of stock loan trades would need to come from inside EquiLend.

174.    While, SL-x continued to meet with UBS, including meetings in June and July of 2014, UBS ultimately remained unwilling to become a customer.

### I.    *Communications with Other Potential Customers*

175.    In addition to Defendants, SL-x attempted to sign up Agent Lenders and other Broker-Dealers as customers for its platform.  A similar pattern emerged.  Agent Lenders were enthusiastic about the SL-x technology and the potential capital savings that central clearing could provide.  But they were concerned about what using SL-x would mean for their relationships with Defendants.

176.     For example, in an October 12, 2012 meeting with Andy Clayton, the Head of Global Securities Lending at Northern Trust Company, a large Agent Lender, SL-x employees were told that Northern Trust could not make any commitment to using SL-x's service until it understood how Goldman Sachs would react.

177.     Similarly, Lou Maiuri, and Executive Vice President and Head of Security Finance for State Street, another large Agent Lender, was very impressed by SL-x's technology and the potential capital savings it could bring to his business.  But before he could consider signing State Street up as an SL-x customer, he wanted to know what Defendants' position was, so as not to cross them.

178.     SL-x also met with the Agent Lender and Broker-Dealer divisions of Deutsche Bank.  In a March 19, 2013, Deutsche Bank's Head of Supply Trading, Kevin Soobadoo, told SL-x executives in a March 19, 2013 meeting that the platform was "brilliant" and "impressive" and was the "most state-of-the-art piece of kit to hit the securities lending space."

179.     These statements were echoed in a July 15, 2013 meeting between SL-x and Jay Schreyer and James Aris, Deutsche Bank employees on the Agent Lender side of the business. In the meeting SL-x was told that Deutsche Bank "will be one of your easiest clients" and that the bank was eager to use SL-x to address "capital efficiency, balance sheet impact and regulation pressures."

180.     Yet again, this early promise was strangely and suddenly extinguished.  In an October 10, 2013 meeting with Soobadoo, SL-x was told that Deutsche Bank had reversed its position and "prefers to be a follower" with respect to evolution in the stock lending market.  It would not sign up for SL-x until its fellow banks agreed to do so.

181.    A similar pattern emerged in conversations with Nomura and Societe General.  In meetings, on February 28 and October 17, 2013, respectively, executives from the banks praised the SL-x platform as "fantastic" and "really an awesome product."

182.    Yet despite numerous subsequent meetings and communications, neither bank was ultimately willing to sign up as an SL-x customer.

183.     SL-x received similar positive feedback from HSBC.  SL-x met repeatedly with HSBC's Global Head of Equity Finance, Karl von Buren.  In an October 16, 2012 meeting, Von Buren claimed that regulatory pressures and inadequacies in HSBC's existing capital essentially required HSBC to embrace SL-x or something like it.  Despite this, HSBC never ultimately became a customer.

184.    In an effort to secure customers for its platform SL-x also met with ABN AMRO, Barclays, Blackrock, BNP Mellon, BNP Paribas, Brown Brothers Harriman, Citibank, and Jefferies.  Yet despite significant interest, multiple demonstrations and repeated praise of the product and the potential savings that it offered, none was willing to cross Defendants by signing up as a SL-x customer.

### J.    Communications with Clearinghouses

185.    In addition to discussions with potential customers, SL-x also entered into discussions with potential providers of central clearing services for transactions executed on its platform.

186.    In early 2013, SL-x entered into a service agreement with Eurex to provide central clearing for transactions involving the stock of companies located in France, Germany, Switzerland, Belgium, or the Netherlands.

187.    Previously, SL-x had entered into discussions with DTCC to provide clearing services for the stock of American companies.

188.    The discussions with DTCC quickly stalled.  SL-x was told by other market participants that this was due to interference from Goldman Sachs.  Key decision-makers at DTCC were "in Goldman's pocket" and would never consent to providing clearing for SL-x so long as Goldman Sachs opposed it.

189.    SL-x also entered into discussions with OCC to provide clearing services for the stock of American companies.

190.    OCC was more receptive to providing clearing, having stuck a deal with QuadriServ to provide central clearing for AQS, a competitor of SL-x that was also attempting to disrupt the antiquated stock lending market.

191.    However, despite assurances from OCC that an agreement could be quickly executed, talks stalled.  Upon information and belief, it is highly likely that that defendants interfered with discussions between SL-x and OCC and pressured OCC not to deliver on the promised functionality and regulatory changes.

## IV.    DEFENDANTS' SECRET AGREEMENT TO UNDERMINE SL-X AND OTHER SIMILAR PRODUCTS

192.    As described above, in virtually every case, Broker-Dealers and Agent Lenders initially praised SL-x's product and expressed significant interest in using it.  But despite repeated requests for demos and additional information, none ultimately agreed to become customers.

193.    As described above, SL-x employees were told by various Defendants that they were concerned about preserving their relationship with EquiLend and that EquiLend Directors had generally discussed a desire for industry improvements to come from within EquiLend.

39

194.    However, what SL-x did not know (and could not know) was that Defendants had actually reached an agreement among themselves to boycott SL-x for the foreseeable future. This agreement was reached during EquiLend meetings that were attended by representatives of Defendants.  Defendants agreed not merely that EquiLend would reject SL-x's offer of a joint venture or acquisition, but also that the individual EquiLend members would, collectively, decline to do business with SL-x until such time as they all agreed to do so.

195.    Upon information and belief, emails, records of Bloomberg chats, and other electronic messages exchanged among EquiLend members reflecting the collusive agreement among the Defendants exist today on the servers of EquiLend and the Defendants who were its owners. These communications indicate that EquiLend representatives, including CEO Brian Lamb, had been instructed not to "break rank" and not to take independent actions in the marketplace until the "EquiLend banks" determined as a group whether they would support any of the new platforms.

196.    Indeed, in other electronic messages sent by Brian Lamb, he bragged that a representative of Goldman Sachs had personally promised him that – thanks to the conspiracy – SL-x and other potential platforms like AQS would fail and that EquiLend would continue to dominate stock lending transactions.

197.    Not only did Defendants boycott SL-x, they also took actions to ensure that other EquiLend members and industry participants did so as well.  On information and belief, Defendants threatened Agent Lenders such as BNY Mellon, State Street, and Northern Trust that doing business with SL-x (or similar products like AQS) would result in economic consequences, such as loss of further stock loan business.

198.    On information and belief, Defendants also pressured DTCC and OCC not to enter into agreements with SL-x, in the hopes of preventing SL-x from launching its platform in the United States.

199.    As a result of Defendants' illegal group boycott and related acts, SL-x's sales efforts were doomed to fail.  Even when SL-x was successful in convincing important decision-makers at Defendants or other market participants that SL-x was a valuable technology worth using, those employees would be overruled by more senior personnel who were aware of the illegal boycott agreement.  Members of the conspiracy would ultimately be pressured not to "break ranks" and would either decline to move forward with the product, or delay implementation indefinitely.

## V.    SL-X IS FORCED OUT OF BUSINESS AND PURCHASED BY EQUILEND

200.    By the summer of 2013, SL-x's investors began to grow frustrated with the resistance that it was facing in the market.  While it had a funding commitment from Palamon, SL-x began to look for additional investors to ensure that it had the resources to continue to develop and market its product for a lengthy period prior to launch.

201.    SL-x identified several potential investors, including Markit Ltd.  Markit, which has since merged with IHS Inc. to form IHS Markit, was a financial information and services company based in London.  Markit provides pricing information concerning securities, indices, and options to thousands of financial industry customers, such as investment banks, hedge funds, and asset managers.

202.    Prior to discussions about investment, Markit had already struck a deal with SL-x.  SL-x's platform contained a direct link to Markit historical trade data.  And Markit was prepared to provide its customers with interest in stock lending with links back to the SL-x platform.

203.     When approached, Markit was initially very interested in investing in the SL-x platform, an investment that would have permitted SL-x to continue development and marketing efforts for the foreseeable future.

204.     However, in early 2014, Markit suddenly and unexpectedly withdrew from investment discussions.

205.     On information and belief, another entity, GFI Group, was also pressured by Defendants not to invest in SL-x, in the hopes that SL-x would ultimately be forced out of business.

206.     After the Markit deal fell through, SL-x engaged an investment bank, Wells Fargo to prepare additional marketing materials and to search for a potential buyer.  However, Wells Fargo was unsuccessful in locating anyone willing to risk the ire of Defendants by investing in SL-x.

207.     In 2015, Defendants negotiated with SL-x's principal shareholder, Palamon, to purchase the patents held by SL-x.  As described above, these patents applied to the core innovations in SL-x's product, including matching and progressive reveal of identity in counterparty negotiations.

208.     While SL-x was gone, Defendants did not want a third party, such as AQS, to purchase this technology and engineer a potential competitor to EquiLend.

209.     Accordingly, in early 2015, EquiLend purchased SL-x's intellectual property for approximately £500,000.

210.     Despite buying the technology, EquiLend had no intention of actually using it. What little due diligence was done on the transaction took place in a thirty-minute call on May 21, 2015, which was only a discussion about the infrastructure needed once EquiLend received

the code.  EquiLend has never even attempted to use SL-x's technology in any of its products.
Instead, it has put the patents on the shelf, knowing that no others will use them.

## VI.  DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM

211.    As a result of their conspiracy, Defendants continue to dominate the stock loan
market, collectively controlling over 70% of the stock loan brokerage market and taking for
themselves more than 65% of the multi-billion-dollars per year in gross revenue generated by
stock lending activity.

212.    As detailed above, Defendants have maintained their dominant market position
and outsize profits by collectively boycotting and suppressing any platforms or services that
might lift the veil of opacity or lead to a fully electronic and transparent trading environment.
The result of the Defendants' anticompetitive actions has been to keep the stock loan market and
each of its participants in the Stone Age.

213.    Stock lending persists in an inefficient, antiquated OTC structure that depends on
the central position of the Defendants.

214.    OTC market structures may make sense where there is customization of terms and
no standard contract.  However, stock loans can be standardized contracts that are well-suited for
a transparent market structure such as a trading platform or an exchange.  By preventing the
development of such platforms or exchanges, Defendants have directly imposed significant
financial harm on other market participants.

215.    In the current bilateral OTC market, trade negotiation remains one-on-one,
placing both borrowers and lenders at a substantial bargaining disadvantage vis-à-vis the
Defendants.  These market end-users lack the information that the Broker-Dealers possess about
pricing (i.e., what the other side of the transaction is willing to pay/accept) and

volume/availability (i.e., which counterparties own the desired stock and how much is available to trade) for any specific loan in question.  Borrowers and lenders also lack any mechanism to effectively "price shop" or efficiently compare dealer pricing and terms over many dealers.  When offered terms by a dealer, there is no way for the lender or borrower to be confident that the dealer's quote is at or near the best available quote in the market, nor to know which other dealer might be willing to supply more favorable terms and pricing.

216.     Because Defendants have inserted and collusively maintained themselves as middlemen, lenders and borrowers cannot work to obtain better terms and pricing by trading directly with the corresponding party that has the actual motive to transact.  Nor can a lender or borrower realistically force multiple dealers to compete against each other for a transaction because of the bilateral nature of the bargaining process.

217.     The current stock loan market involves high search costs and inefficient pricing.  It can take numerous phone calls, emails, texts, or other communications over several hours to locate a hot stock and negotiate pricing.  The lender has no indicative level of pricing other than the demand information provided by the brokers, which the lender has no way to verify.  In other words, the securities lending market requires considerable manual effort to complete transactions that in other markets take seconds or minutes at most.  Because of the fragmented nature of the market, identical loans can trade simultaneously through different channels at very different prices.  These high search costs preclude arbitrage across liquidity pools.

218.     While a lender or borrower can, in theory, reject the price terms quoted by the dealer with whom it is negotiating and search for better terms, these negotiations would be cumbersome and difficult to do.  The market participants cannot choose the best terms from among a large number of various dealers simultaneously.  And the fact that a lender or borrower

could eventually negotiate quotes from multiple dealers does not in itself cause dealers to compete aggressively with each other.

219.    When facing a lender or borrower, each dealer holds a degree of monopoly power because the counterparty has no ability to pick the best of many simultaneously executable terms.  Defendants' exploitation of this monopolistic market power both (i) reduces the volume of trades that would otherwise occur in the stock lending market, and (ii) raises the costs associated with searching for desirable transaction terms (i.e., reduces what is known as "matching efficiency").

220.    Separate and apart from the harms caused to ordinary market participants, SL-x also suffered significant harm due to the destruction of its business.

221.    Because of Defendants' conduct, SL-x was forced to close its doors and sell off its intellectual property for a fraction of the true value of the company.

## VII.   OTHER FACTS DEMONSTRATE THE PLAUSIBILITY OF DEFENDANTS' CONSPIRACY

222.    In addition to the specific conduct alleged above, numerous other facts demonstrate the inherent plausibility of the stock loan conspiracy alleged herein.

223.    As detailed below, the (i) lack of evaluation in the Stock Loan Market, which has resisted electronic trading to a degree not seen elsewhere; (ii) the actions of Defendants against companies other than SL-x; and (iii) Defendants' history of criminal behavior, specifically market manipulation and the formation of illegal antitrust conspiracies all lend credence to the conspiracy against SL-x.

### A.    The Antiquated Structure of the Stock Loan Market

224.    Financial markets typically evolve over time.  Many financial markets have evolved from an inefficient and high-transaction-cost OTC market to an exchange where

participants can meet and transact.  Although the stock loan market has made other markets more efficient, it has not itself grown more significantly efficient over time.  The stock loan market today remains almost exclusively an opaque, OTC market that has not been meaningfully improved, or scarcely even been touched, by more modern, transparent trading methods.

225.    There is no natural reason for the stock loan market to continue to operate this way.  There are no technological or structural reasons that this market could not be transformed into a modernized electronic marketplace, as has happened with a number of other financial services markets.  The quintessential example of a modern centrally-cleared electronic trading platform is the publicly-traded stock exchange.  Stocks (or equities) are almost entirely traded on technology-driven electronic exchange platforms, which afford participants instantaneous information on trading flow, pricing and volume.  These exchanges also provide a marketplace through which buyers and sellers can directly transact via clearing brokers (such as Charles Schwab, or any other broker with a membership on the relevant exchange) who provide access to and "sponsorship" on the exchange for a minimal and transparent fee.  This allows sellers of securities to offer shares to the entire market and take the highest price, and buyers of securities to make an offer to the entire market and take the lowest price, via a central limit order book.  But this is Defendants' nightmare for the stock loan market.

226.    Electronic trading is unquestionably beneficial to market participants.  It provides greater price and volume transparency on market trades, expands the number and type of potential counterparties, and does not involve a fee-extracting "middleman" or intermediary between the buyer and seller.  Consequently, such trading results in greater efficiency and significantly better prices for both sides.  This method of trading is the norm for the securities of most publicly traded companies.

227.    The efficiencies created by electronic trading would reduce the cost of portfolio management strategies for investors, increase the number of borrowers, reduce the cost of borrowing, and stimulate more stock loan trading and investment.  It would also increase the returns that lenders earn on their portfolios.  All of this would further lower the cost for companies to raise capital in the equity markets.

228.    But the stock loan market has none of this.  It is devoid of a central marketplace where buyers and sellers can transact or view pricing and volume information across the entire market.  As a result, borrowers today complain that the Defendants' "middleman" pricing is volatile and opaque.  Lenders suffer from this same price opacity, and further complain that they cannot lend out more than a small fraction of their available stock as transactions are bottlenecked with the Defendants.  The inability of borrowers and lenders to find and transact with each other results in a massive waste of economic resources, yielding artificially higher costs of investment and lower returns on investment.  All market participants would benefit from a more modern and efficient stock loan market.  That is, all participants except Defendants.

229.    A direct effect of the outdated OTC market structure is that Defendants are able to exploit the inefficiencies to reap inflated profits at the expense of borrowers and lenders.  Bringing lenders and borrowers together in a regulated, centralized trading platform would lower the cost of borrowing and increase the returns on lending.  In that trading environment, investors can trade anonymously in real time on electronic platforms, with live, executable pricing and with any qualified trading partner.

230.    On the New York Stock Exchange or NASDAQ, for example, buyers and sellers (via the electronic platform) make offers to "all" potential counterparties simultaneously—with the platform system matching trades primarily based on price.  The seller gets the highest price

47

offered and the buyer gets the lowest price available.  It is only a function of the Defendants'

illegal, collusive and monopolistic practices that the modern stock loan market does not operate

in this manner.

### B.   Defendants' Actions Against Other Modernizing Companies

231.    Recent litigation shows that SL-x was not the only company that Defendants

forced out of the marketplace in service of their stock loan conspiracy.

### i.    AQS

232.    In a case captioned, *QS Holdco Inc. v. Bank of America Corporation, et al.*, Case

No 18 Civ. 824 (KPF), the beneficial owner of AQS details a litany of anticompetitive conduct

by Defendants to boycott, cripple, and ultimately acquire AQS, an early competitor of SL-x.

233.    Like SL-x, AQS was born out of a desire to provide an online marketplace for

stock lending transactions, complete with modern tools designed to streamline negotiations and

permit bids and asks by counterparties seeking a potential deal.

234.    Like SL-x, AQS entered into an agreement with a clearinghouse to provide

central clearing of transactions.  Where SL-x entered into an arrangement to clear certain

European transactions through Eurex, AQS also entered into a contract with OCC to clear

transactions involving US stock.

235.    On information and belief, the contract with OCC was only possible because

Wayne Luthringshausen, the Chief Executive Officer of OCC, intentionally removed the OCC

board members (including Defendants) from the majority of negotiations and scheduled specific

board votes for times when he knew that the most vociferous supporters of Defendants'

conspiracy would not be able to attend.

236.    AQS launched on January 7, 2009, with central clearing from OCC.  By late 2009, AQS announced that he had also reached an agreement with Eurex to provide central clearing of European stock loan transactions.

237.    Unlike SL-x, which provided a set of tools by which Broker-Dealers and Agent Lenders could efficiently match, negotiate, and consummate stock lending transactions on behalf of clients, AQS was a direct, all-to-all platform for stock loan transactions.  As such, AQS sought to disintermediate Broker-Dealers and Agent Lenders entirely.

238.    Because of the threat that this posed to Defendants and their domination of the stock loan market, they took immediate action to prevent AQS from succeeding.

239.    On information and belief, Goldman Sachs communicated to AQS that it would not support the platform under any circumstances.

240.    On information and belief, Defendants Morgan Stanley, JP Morgan, Credit Suisse, and UBS each communicated, in separate meetings with AQS executives, an identical position concerning AQS: that the only way they would support the platform was if AQS made it a broker-only platform, uniformly conditioning their participation on lenders and borrowers being barred from trading on the platform.

241.    On information and belief Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, Credit Suisse, and UBS also refused to give their customers access to AQS.  Stock loan market standards require that a broker-dealer (acting as a "qualified borrower") be the legal borrowing entity in every stock loan transaction, and OCC's amended by-laws provided that only broker-dealer "clearing members," such as Defendants, may transact through the clearing house, either as the lender or borrower.  Accordingly, for borrowers and agent lenders to have access to

trade on the AQS platform through OCC, they needed to be "sponsored" by, and granted access through, a broker-dealer, who would stand in to facilitate and clear their trades.

242.    On information and belief, Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, Credit Suisse, and UBS' point blank denial of access for their clients to AQS meant that their clients simply could not trade on the platform, starving AQS of potential customers.

243.    On information and belief, Bank of America, through its acquisition of Merrill Lynch, was initially supportive of the AQS platform and permitted its customers to access its central clearing benefits by acting as a sponsor.

244.    On information and belief, William Conley, acting on behalf of Goldman Sachs and the other Defendants, pressured Bank of America to reverse course and to join the other Defendants in its opposition to AQS.

245.    On information and belief, a Bank of America executive told a Quadriserv executive that Quadriserv needed to win over Goldman Sachs in order for AQS to grow.

246.    On information and belief, Bank of America responded to pressure from other Defendants by ordering its stock loan desk to limit the volume of transactions that could be placed on the AQS platform.  Going forward, the desk could put on only $1 billion of notional loans each day, a tiny fraction of Bank of America's normal daily volume.

247.    On information and belief, Defendants also pressured other market participants not to use AQS's software.

248.    On information and belief, in 2012, Goldman Sachs told executives at BNY Mellon, including James Slater, Head of Global Collateral Management and Securities Finance, that if BNY Mellon continued to use the AQS platform, Goldman Sachs would return open stock

borrowing trades with BNY and stop trading with the BNY Mellon stock loan desk altogether. Faced with this threat, BNY Mellon withdrew its support for AQS.

249.    On information and belief, Defendant Goldman Sachs met regularly with State Street to discuss AQS and Goldman Sachs pressured State Street not to support the platform.

250.    On information and belief Defendants also successfully pressured senior management of Barclays Global Investors to pull out at the last minute as an investor in the Quadriserv Series C and D financing rounds.

251.    On information and belief, Defendants used their influence over the OCC board to sabotage the planned acquisition of AQS by OCC in 2015.

252.    On August 1, 2016, EquiLend purchased the assets of AQS, which had been effectively forced out of business.  On information and belief, EquiLend has made absolutely no use of those assets and purchased them only so that they could not be put to productive use by any other company.

ii.      *Data Explorers*

253.    Unlike SL-x and AQS, Data Explorers was an information services company. Rather than create an online marketplace for stock lending transactions, Data Explorers sought to sell information to market participants, gathering complete stock loan transaction data from its customers and providing lenders, borrowers, and broker-dealers with access to the aggregated dataset.

254.    But this different focus did not shield Data Explorers from Defendants' collusive behavior.  On information and belief, knowing that pricing transparency could undermine their stranglehold on the stock lending market, Defendants employed the same anticompetitive tactics against Data Explorers that they did against SL-x and AQS.

255.    Data Explorers's first customers were Agent Lenders.  Data Explorers gathered stock lending transaction data from Agent Lenders, aggregated it, and disclosed the aggregated information back to its customers.  This permitted the participating Agent Lenders to see how well their prices they had received compared to those that others had received.

256.    This data was provided in several forms.  Data Explorers first developed a product called Performance Explorer, which allowed Agent Lenders to type in a ticker symbol to see the average lending rate for that security, based on the underlying data that was provided by participating agent lenders.  Performance Explorer was followed by Transaction Explorer, a more advanced technology that gave Agent Lenders access to a deep array of "wholesale" data that Data Explorers had compiled from banks and other agent lenders.

257.    Ultimately, Data Explorers expanded beyond the Agent Lender side of the stock loan market.  Data Explorers created a separate version of Transaction Explorer designed specifically for borrower clients.  This version of Transaction Explorer enabled borrowers to access "bid rates" (what borrowers were paying to borrow securities), along with analytics showing how liquid or illiquid a given security was, how heavily borrowed or "short" a security was, and how many buy-side players were borrowing a security.

258.    On information and belief, Defendants pressured Data Explorers to keep the data that it was obtaining from Agent Lenders separate from the data that it was obtaining from its borrower clients.  Defendants did not want Data Explorers to provide market participants with comprehensive information concerning the prices and fees charged in connection with stock loan transactions.

259.    With assurances that the data would remain "siloed" between borrowers and lenders, Data Explorers secured access to several of Defendants' pricing data in return for providing them with data analytics.

260.    However, on information and belief, Defendants took surreptitious steps to undermine the quality of the market data that Data Explorers provided to its customers. For example, when borrower clients instructed Morgan Stanley to provide Data Explorers with their market data, Morgan Stanley would provide a file that contained stale, sparsely populated data scrubbed clean of any timely or actionable information.

261.    On information and belief, even with these restrictions, Defendants were concerned that Data Explorers might begin offering "whole market" pricing information that aggregated data from both lenders and borrowers in stock loan transactions.  This information would reveal the outsized fees that Defendants took for themselves and their supracompetitive profits.

262.    On information and belief, in 2011, Defendants met, under the auspices of discussing EquiLend business, to discuss the threat posed by Data Explorers and how to neutralize that threat.

263.    On information and belief, Defendants agreed to set up a competing business, under the auspices of EquiLend, that would seek to drive Data Explorers out of the market.  This new business, called DataLend, would be offered without substantial charge, undercutting Data Explorers's business model.

264.    On information and belief, DataLend was specifically constructed to ensure that beneficial owners could never see the spread between what they were paid to lend securities and what borrowers were charged to borrow them.

265.     Defendants formed DataLend as a division within EquiLend. On information and belief, they then agreed, in lockstep, to distribution agreements with DataLend that placed substantially identical restrictions on how each Defendant's trading data could be used.  These agreements included a prohibition on disclosing any prime broker data to lender or borrower customers.  Among other things, the Defendants agreed amongst themselves, and then with DataLend, that they would not permit bid-side data (that is, data showing what borrowers paid to borrow securities) to be provided to any beneficial owners.

266.     On information and belief, Conley from Goldman Sachs, Kelleher from JP Morgan, and other representatives of Defendants on the board of EquiLend were involved in the discussions that led to these parallel agreements.

267.     EquiLend's plan worked.  Agent Lenders used the new stream of low-cost information provided by DataLend to renegotiate prices with Data Explorers.  Data Explorers' revenues plummeted and its momentum came to a dead stop.

268.     Crippled by the assault from DataLend, Data Explorers forced to sell itself to Markit, a company over which Defendants exert significant influence.  Knowing the consequences of competing against Defendants, Markit has never threatened to provide "whole market" stock lending pricing data using the technology purchased from Data Explorers.

### C.     *Defendants' Prior Illegal Conduct*

269.     The stock loan conspiracy is but the latest in a string of anticompetitive conspiracies involving the financial markets in which the Defendants have participated—all with the goal, as here, of preserving an existing anticompetitive advantage against the natural tide of progress. As detailed below, Defendants' blatant disregard for the antitrust laws over the last decade has been exposed in numerous instances in relation to other financial markets. In several

instances, certain of the Defendants have pled guilty to the anticompetitive conduct. In other instances, certain of the Defendants have been fined for, or settled claims relating to, alleged anticompetitive conduct. These admissions not only demonstrate a pattern of repeated conduct, but demonstrate more generally the existence of a corporate culture wherein Defendants are ready and willing to violate the law and collude with one another whenever they deem it necessary to preserve profits. This history and culture of collusion demonstrates the inherent plausibility of the stock loan conspiracy alleged herein.

*i.*     *Municipal Bond Investments Market*

270.     In or around 2010, Defendant Bank of America approached the United States Department of Justice ("DOJ") and voluntarily reported its involvement in a conspiracy to rig bids in the municipal bond derivatives industry.[2] Later, on December 7, 2010, the DOJ announced that Bank of America agreed to pay $137.3 million in restitution to federal and state agencies in connection with its admitted participation in that conspiracy.[3] The restitution payment, along with Bank of America's cooperation in the DOJ's parallel investigations of Bank of America's co-conspirators, was a condition for Bank of America's admission into the DOJ's Antitrust Corporate Leniency Program.[4]

271.     On May 4, 2011, the DOJ announced that Defendant UBS AG, as part of a non-prosecution agreement, agreed to pay $160 million in restitution, penalties, and disgorgement to

---

[2]     *See* Press Release, DOJ, *Bank of America Agrees to Pay $137.3 Million in Restitution to Federal and State Agencies as a Condition of the Justice Department's Antitrust Corporate Leniency Program* (Dec. 7, 2010), https://www.justice.gov/opa/pr/bank-america-agrees-pay-1373-million-restitution-federal-and-state-agencies-condition-justice.

[3]     *Id.*

[4]     *Id.*

federal and state agencies in connection with admitted anticompetitive conduct in the municipal

bond investments market.[5]  As part of its non-prosecution agreement, UBS AG admitted that

certain of its then-employees "entered into unlawful agreements to manipulate the bidding

process and rig bids on certain relevant municipal contracts, and made payments and engaged in

other activities in connection with those agreements, in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code."[6]

272.    On July 7, 2011, the DOJ announced that Defendant J.P. Morgan Chase & Co., as

part of a non-prosecution agreement, agreed to pay $228 million in restitution, penalties, and

disgorgement to federal and state agencies in connection with anticompetitive conduct in the

same market—i.e., the municipal bond investments market.[7]  As part of its non-prosecution

agreement, J.P. Morgan Chase & Co. admitted that certain of its then-employees "entered into

unlawful agreements to manipulate the bidding process and rig bids on certain relevant

municipal contracts, and made payments and engaged in other activities in connection with those

agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of

Title 18 of the United States Code."[8]

---

[5]    *See* Press Release, DOJ, *UBS AG Admits to Anticompetitive Conduct by Former Employees in the Municipal Bond Investments Market and Agrees to Pay $160 Million to Federal and State Agencies* (May 4, 2011), https://www.justice.gov/opa/pr/ubs-ag-admits-anticompetitive-conduct-former-employees-municipal-bond-investments-market-and.

[6]    *See Non-Prosecution Agreement letter In re UBS AG*, DOJ, (May 4, 2011), https://www.justice.gov/atr/file/761041/download.

[7]    *See* Press Release, DOJ (July 7, 2011), https://www.justice.gov/opa/pr/jpmorgan-chase-admits-anticompetitive-conduct-former-employees-municipal-bond-investments.

[8]    *See* Letter from Christine A. Varney, DOJ, to Thomas Mueller (July 6, 2011), https://www.justice.gov/sites/default/files/atr/legacy/2011/07/07/272815a.pdf.

*ii.      LIBOR Market*

273.    On December 19, 2012, the DOJ announced that Defendant UBS AG, as part of a

non-prosecution agreement, had agreed to pay $1.5 billion in fines for manipulating LIBOR

rates. According to the DOJ's press release, "By causing UBS and other financial institutions to

spread false and misleading information about LIBOR, the alleged conspirators we've charged—

along with others at UBS—manipulated the benchmark interest rate upon which many

transactions and consumer financial products are based."[9]  Other banks ensnared by this

investigation included The Royal Bank of Scotland, Rabobank, Deutsche Bank, and Barclays,

among others.[10]

*iii.      FX Spot Market*

274.    Beginning in 2013, media reports surfaced that governmental regulators and

enforcement authorities in the U.S. and Europe were investigating potential manipulation of the

foreign exchange ("FX") market.  Those investigations quickly grew in scope to include

authorities from across the globe, and have already resulted in criminal guilty pleas, settlements,

and fines totaling over $11 billion, as well as the release of orders, notices, and reports detailing

exactly how the banks colluded to manipulate the FX market.

275.    On May 20, 2015, the DOJ announced that Defendants JP Morgan and UBS,

along with Barclays, Citi, and RBS, were fined a total of $3 billion by the DOJ, and each pled

---

[9]    *See* Press Release, DOJ (Dec. 19, 2012), https://www.justice.gov/opa/pr/ubs- securities-
japan-co-ltd-plead-guilty-felony-wire-fraud-long-running-manipulation-libor.

[10]    *See* Financial Institution Fraud, Criminal Division, DOJ, https://www.justice.gov/
criminal-fraud/financial-institution-fraud.

guilty to criminal conspiracy charges for manipulating FX prices and benchmark rates.[11]  The

DOJ has since brought criminal charges against individual employees and former employees of

the banks for their role in manipulating the FX market, including a former Managing Director at

JP Morgan.[12]  Also in May 2015, the Federal Reserve imposed more than $1.8 billion in fines on

Defendants Bank of America, JP Morgan, UBS, plus Barclays, Citi, and RBS, for their "unsafe

and unsound practices in the foreign exchange markets,"[13] and the New York Department of

Financial Services fined Barclays over $400 million for conspiring with other banks, including

JP Morgan, to manipulate FX prices.[14]

276.    These settlements followed a wave of Orders from November 2014, where the

U.S. Commodity Futures Trading Commission ("CFTC")[15] and U.K. Financial Conduct

---

[11]    *See* Press Release, DOJ, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas; *see also* 2015 Enforcement Actions, CFTC, http://www.cftc.gov/LawRegulation/Enforcement/ EnforcementActions/ 2015EnforcementActions/index.htm.

[12]    *See* Press Release, DOJ, *Three Former Traders for Major Banks Indicted in Foreign Currency Exchange Antitrust Conspiracy* (Jan. 10, 2017), https://www.justice.gov/opa/pr/three-former-traders-major-banks-indicted-foreign-currency-exchange-antitrust-conspiracy.

[13]    *See* Press Release, Federal Reserve, *Federal Reserve announces fines totaling more than $1.8 billion against six major banking organizations for their unsafe and unsound practices in the foreign exchange (FX) markets* (May 20, 2015), https://www.federalreserve.gov/newsevents/press/enforcement /20150520a.htm.

[14]    See Consent Order, ¶ 44, *In the Matter of Barclays Bank PLC* (Nov. 17, 2015), http://www.dfs.ny.gov/about/ea/ea151117.pdf.

[15]    *See* Press Release, CFTC, *CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates* (Nov. 12, 2014), http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

Authority[16] imposed over $1.9 billion in fines on JP Morgan, UBS, Citi, HSBC and RBS for manipulating the FX market, the Office of the Comptroller of the Currency fined Bank of America, JP Morgan, and Citi another $950 million,[17] and the Swiss Financial Market Supervisory Authority fined UBS $141 million for "manipulation, collusion, and other market abusive conduct."[18]

277. Other global regulators that have investigated the banks' manipulation of the FX market include the Brazilian Council for Economic Defense, which imposed fines on JP Morgan and several other banks,[19] the South African Competition Commission, which found that Bank of America, Credit Suisse, JP Morgan, and several other banks had a "general agreement to

---

[16] *See* Press Release, U.K. Financial Conduct Authority, *FCA fines five banks 1.1 billion for FX failings and announces industry-wide remediation program* (Nov. 12, 2014), http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings.

[17] *See* Press Release, OCC, *OCC Fines Three Banks $950 Million for FX Trading Improprieties* (Nov. 12, 2014), http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html.

[18] *See* Press Release, The Swiss Financial Market Supervisory Authority, *FINMA sanctions foreign exchange manipulation at UBS* (Nov. 12, 2014), https://www.finma.ch/en/news/2014/11/mm-ubs-devisenhandel-20141112.

[19] *See* Noticias, Administrative Council for Economic Defense, Brazil, *CADE signs five agreements regarding a cartel investigation in the foreign exchange market and opens a new cart investigation in the Brazilian exchange market* (Dec. 9, 2016), http://en.cade.gov.br/cade-signs-five-agreements-regarding-a-cartel-investigation-in-the-foreign-exchange-market-and-opens-a-new-cartel-investigation-in-the-brazilian-exchange-market.

collude,"[20] the Australia Securities and Investment Commission,[21] and the Korea Fair Trade Commission.[22]  Many of the governmental investigations of FX manipulation remain ongoing, including major inquiries by the European Commission.[23]

278.     The governmental settlements lay out the details of how the banks colluded to manipulate FX prices to their benefit. For instance, the CFTC found that Defendants JP Morgan and UBS, along with Citi, HSBC, and RBS, "used private electronic chat rooms to communicate and plan their attempts to manipulate the Forex benchmark prices."[24]  Traders used those inter-bank chat rooms to "coordinate[] their trading with certain FX traders at other banks to attempt to manipulate certain FX benchmark rates," and to "disclose[] confidential customer order information and trading positions, alter[] trading positions to accommodate the interests of the collective group, and agree[] on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates." Those exclusive chatrooms were often given colorful

---

[20]     *See* Media Statement, Competition Commission, South Africa, *Competition Commission prosecutes banks (currency traders) for collusion* (Feb. 15, 2017), http://www.compcom.co.za/wp-content/uploads/2017/01/Competition-Commission-prosecutes-banks-currency-traders-for-collusion-15-Feb-2016.pdf.

[21]     *See* Georgia Wilkins, *ASIC launches investigation into foreign exchange benchmarks*, THE SYDNEY MORNING HERALD (Mar. 21, 2014), http://www.smh.com.au/business/asic-launches-investigation-into-foreign-exchange-benchmarks-20140320-355wo.html.

[22]     *See South Korea fines Deutsche Bank, BNP Paribas $157,000 over FX forwards rigging,* REUTERS, (May 16, 2017), http://www.reuters.com/article/us-southkorea-antitrust-idUSKCN18C06G.

[23]     *See* Gaspard Sebag and Stephanie Bodoni, *FX Probe Said to Emerge From Shadows as EU Seeks Bank Data*, Bloomberg (June 3, 2016), https://www.bloomberg.com/news/articles/2016-06-03/currency-probe-said-to-emerge-from-shadows-as-eu-seeks-bank-data.

[24]     *See, e.g.*, Order Instituting Proceedings, *In the Matter of JPMorgan Chase Bank, N.A.*, CFTC Dkt. No. 15-04 (Nov. 11, 2014).

names like "The Cartel," "The Mafia," "The Club," "The Bandits' Club," "The Dream Team,"

"One Team, One Dream," and "The Sterling Lads."

<em>iv.     ISDAfix</em>

279.    Numerous Defendants have also paid substantial sums to government regulators,

private plaintiffs, or both to settle claims that they exploited their position on a panel of banks to

manipulated the widely-used financial benchmark known as ISDAfix in violation of antitrust and

anti-manipulation laws.

280.    Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, and

UBS have collectively paid over $222 million to settle private antitrust and common laws claims

concerning these banks' collusive manipulation of the ISDAfix benchmark at the expense of

their counterparties and clients. Goldman Sachs has paid an additional $120 million to settle

proceedings initiated by the CFTC for conduct the Commission described at times as

"particularly brazen"[25] and always designed to move the benchmark "in the direction that was

best for Goldman at the expense of its counterparties and clients."[26]

281.    Numerous of Goldman Sachs' horizontal competitors also paid hefty settlement

sums to the CFTC for their manipulation of ISDAfix.[27]  Numerous investigations into ISDAfix

manipulation by various governmental bodies remain ongoing. Highlighting the seriousness of

---

[25]    *See In re The Goldman Sachs Group, Inc., and Goldman, Sachs & Co.*, CFTC No. 17-03, 2016 WL 7429257, at *8 (Dec. 21, 2016).

[26]    *Id.* at *7.

[27]    *See In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC No. 15-25, 2015 WL 2445060 (May 20, 2015); *In re Citibank, N.A.*, CFTC No. 16-16, 2016 WL 3035030 (May 25, 2016); *In re The Royal Bank of Scotland plc*, CFTC No. 17-08, 2017 WL 511925 (Feb. 3, 2017).

the misconduct of the ISDAfix panel banks, these investigations reportedly involve a criminal dimension.[28]

282.    Defendants' misconduct related to ISDAfix was undertaken, like that described above, to line their own pockets at the expense of investors, providing another illustration of a lack of internal controls and a culture where the bottom line was used to justify serious misdeeds.

*v.    Credit Default Swaps*

283.    In the Credit Default Swaps ("CDS") litigation,[29] Defendants Bank of America, Credit Suisse, Goldman Sachs, J.P. Morgan & Chase, Morgan Stanley, and UBS, together with several entities not named as defendants in this action, were accused of participating in a remarkably similar conspiracy to the one alleged here.

284.    In the CDS litigation, plaintiffs alleged that the defendants—who dominated the over-the-counter CDS market and took advantage of its inefficiencies to reap supracompetitive profits from bid/ask spreads—were threatened by the development of electronic exchanges and clearinghouses for CDS transactions. These electronic trading platforms threatened to introduce price transparency and other efficiencies that would have eliminated the CDS defendants' ability to charge artificially inflated bid/ask spreads. In response, the CDS defendants (most of which are named as Defendants here) allegedly conspired to squash this threat by agreeing in secret meetings to, among other things, boycott the use of these new trading platforms. As a result,

---

[28]    *See* Matthew Leising & Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, BLOOMBERG (Sept. 9, 2014), https://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn. Indeed, at his deposition in the private civil case, the head of Deutsche Bank's swaps desk from 2007 to 2012 invoked his Fifth Amendment right to avoid self-incrimination in response to questions about his desk's ISDAfix practices.

[29]    *In re Credit Default Swaps Antitrust Litigation*, No. 13-md-2476 (DLC) (S.D.N.Y.).

according to the CDS plaintiffs, the defendants were successful in blocking the natural evolution of the CDS market from an inefficient, over-the-counter market to a more efficient, exchange-traded market, resulting in significant damages to those market participants who were forced to continue paying grossly inflated bid/ask spreads.

285.    The defendants in the CDS litigation ultimately agreed to pay over $1.86 billion to settle those claims.

## VIII.  THE USE OF EQUILEND AS A VEHICLE FOR ILLEGAL CONDUCT TRIGGERS SPECIAL SCRUTINY

286.    As previously described, Defendants routinely used their positions on the EquiLend board to co-opt EquiLend as a vehicle through which to promote and achieve their anticompetitive objectives.  In doing so, EquiLend was not acting as a legitimate market participant according to its own economic best interests as an independent competitive venture. Instead, it was used in illegitimate, non-competitive ways and took actions that in many cases did not further its own economic interests.

287.    Nowhere is this better demonstrated than in EquiLend's response to SL-x's offer to purchase it in September of 2011.  Had EquiLend been acting as an ordinary profit-maximizing entity, it would have at least engaged in discussions concerning a potential acquisition price that would have yielded an immediate and generous return to its shareholders.

288.    Instead, EquiLend swiftly rejected acquisition by SL-x at any price.  This failure to even bargain demonstrates that EquiLend's true value to Defendants was not in its ability to generate profits, but rather as a forum by which to exercise improper control over the stock lending industry.

289.    EquiLend Holdings LLC was formed in 2001, for the ostensible purpose of "optimiz[ing] efficiency in the securities finance industry by developing a standardized and

centralized global platform for trading and post-trade services."[30]  As described above, EquiLend mainly provides post-trade services to Broker-Dealers and Agent Lenders, such as reconciliation, contract comparison, mark-to-market comparison, billing comparison, billing delivery, recalls, and returns.

290.    In addition, EquiLend offers a "bulletin board" service for Agent Lenders to post available inventory.  This bulletin board is supplemented by a crude matching tool called AutoBorrow.  Each trading day, AutoBorrow contacts broker-dealer subscribers in a one-by-one, sequential order, with a basket of every general collateral stock that agent lenders are currently offering.  Each broker-dealer in the queue, in turn, decides how much stock loan quantity they wish to borrow, and that quantity is then executed.  There is no negotiation and no bidding about prices, which are arbitrarily set by Agent Lenders.  Because of this, AutoBorrow facilitates only a small fraction of stock lending transactions and is next to useless for filling hard to find securities orders.

291.    In contrast to SL-x's product, EquiLend has never offered fully electronic, price transparent trading capabilities or the ability to negotiate terms with multiple potential counterparties simultaneously.   Nor does it offer central clearing to market end users.  Even board members and former board members of EquiLend often complain about its ineffective matching function and limited functionality.

292.    The original investing firms in EquiLend were Barclays Global Investors, Bear, Stearns & Co., The Goldman Sachs Group Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc., Merrill Lynch & Co., Morgan Stanley, Northern Trust Corp., State Street Corp., and UBS Warburg—each of which committed $4 million to the newly formed enterprise.

---

[30]    *See About Us*, EQUILEND, at http://www.EquiLend.com/about/

During the relevant period, the ten owners of EquiLend included Defendants:  Bank of America

(formerly Merrill Lynch), Credit Suisse,[31] Goldman Sachs, JP Morgan, Morgan Stanley, and

UBS.

293.    Since EquiLend's inception, Defendants have dominated and controlled EquiLend

through its Boards of Directors. Those board members of EquiLend Holdings LLC (EquiLend's

USA entity) during the relevant period who were also employees of Non-EquiLend Defendants

include:

| Entity | Employees | Entity | Employees |
|--------|-----------|--------|-----------|
| Bank of America | Robert Genkinger, Managing Director, Equity Finance Sales & Trading | JP Morgan | William Marcoullier, New York Desk Head; <br><br> Michael Kelleher, Managing Director, Equity Finance; <br><br> Ben Challice, Managing Director, Global Head of Collateral Management & Agency Lending; <br><br> Stefano Bellani; Managing Director, Global Head of Trading Services; <br><br> Judy Polzer, Global Head of Securities Lending Product |
| Credit Suisse | Fred Nadd-Aubert, Director, Prime Services & Strategic Product Development; <br><br> Gene Gemelli, Director, Prime Services, Strategic Product Development | Morgan Stanley | Anthony Schiavo, Vice Chair, Managing Director |

---

[31]   Credit Suisse became a co-owner of EquiLend in 2005.

| Entity | Employees | Entity | Employees |
|---|---|---|---|
| Goldman Sachs | Shawn Byron, Managing Director<br><br>William Conley, Head of Global Securities Lending | UBS | Brendan Cusick, Managing Director |

294.    For EquiLend Europe Ltd., board members who were also employees of the

Defendants include:

| Entity | Employees | Entity | Employees |
|---|---|---|---|
| Bank of America | Rajeev Patel, Global Head of Securities Lending and Head of EMEA Equity Finance | JP Morgan | John Shellard, Managing Director;<br><br>Jonathan Cossey, Managing Director, Head of Equity Finance;<br><br>Edward McAleer, Managing Director |
| Credit Suisse | Karl Bishti, European Prime Brokerage Desk Head;<br><br>Ralph Lehnis, Managing Director, Credit Suisse | Morgan Stanley | Matt Collins, Executive Director, Head of European Securities Lending |
| Goldman Sachs | Martin Cosgrove, Managing Director;<br><br>Michael Slomienski, Vice President | UBS | James Buckland, Global Head of Stock Borrow & Lending |

295.    EquiLend is nominally organized as a joint venture, but this does not shield it—or

Defendants—from the antitrust laws.  The reason is that EquiLend does not act in its own

economic interests as an independent, rational market participant by improving its products and

services so as to meet customer demand and generate increased revenue for the company.

Instead, EquiLend has been used by Defendants as a centralized forum for collusion and the

advancement of their particular anticompetitive interests in the stock loan market.

296.    The cover story that EquiLend is a legitimate, for-profit business enterprise is belied by the actions taken, and not taken, by EquiLend and its member banks.  Defendants used EquiLend to: (i) suppress price transparency by refusing to release pricing data to its customers, despite having access to this data and despite a clear market demand for such data; (ii) force competitors out of the market by coercing their customers to use EquiLend and/or DataLend, even though EquiLend and DataLend offered lower quality or entirely different services than what their customers desired and what prospective competitors offered; and (iii) stymie procompetitive market developments by purchasing valuable patents and trading platform technology from SL-x and others, and then refusing to use or capitalize on those assets in any way, despite the fact that such patents and platform technology were essential for market developments that were in high demand and could have brought extra revenue into the company.

297.    EquiLend's role as a vehicle of collusion is illustrated by the way its board members steadfastly ignored the distinction between their prime brokerage businesses and their supposedly independent "joint venture."  Goldman Sachs' Conley talked about starting DataLend to ensure wholesale prices would not "kill our business"— meaning the Broker-Dealer Defendants' stock lending business.  Similarly, as SL-x made the rounds of the Defendants in an effort to sell the platform, at every turn they were told that the EquiLend directors had decided that any evolution toward central clearing would happen only through EquiLend—meaning, through a vehicle that the Defendants controlled.  In meeting after meeting, the Defendants made clear that they considered themselves bound by understandings reached in EquiLend board meetings.

298.    If EquiLend had truly behaved as a profit-maximizing firm, it would naturally have sought to contribute to the competitive evolution of the stock loan market by promoting

trading efficiency through a centrally-cleared electronic marketplace and selling clients transparent access to its market data.  EquiLend would also have capitalized on the technology that it purchased from SL-x and AQS by further developing that technology for its own use or licensing to third parties.

299.    Instead, EquiLend remains a Potemkin village for Defendants' collusive and anticompetitive behaviors.  The firm offers just enough operational efficiency to be relevant through its bilateral trading platform and the provision of certain administrative and back-office services.  Yet it carefully avoids (and takes active steps to thwart others from engaging in) any activity that would threaten the Defendants' position as dominant market intermediaries.

300.    Even ignoring the actions EquiLend failed to take that would have modernized the market, the actions it did take were not those of an independent enterprise.  If EquiLend was content to act as an industry utility, leaving innovation to other firms, it is unclear why it chose to purchase revolutionary matching and trading technology from two different firms, only to do nothing with it.  If EquiLend was content with its position as a bilateral trading platform and trade processing service, it is unclear what moved it to introduce a subpar data product at unbelievably low prices, at just the right time to kill a product that threatened to expose the stock lending market to full price transparency.  That EquiLend was able to do so shows only that it was an effective tool of Defendants' conspiracy, because it was capable of quickly shifting the direction of the development of the stock lending market.

301.    The actions taken by the Defendants through EquiLend amounted to naked restrictions on competition and output.  They were intended to, and did, reduce the volume and quality of stock lending overall, and the amount and quality of pricing data distributed by EquiLend and available to market participants, to the detriment of all market participants except

for Defendants.  Defendants' restrictions on EquiLend's development and services were not

necessary for or related to any procompetitive actions by EquiLend.  In fact, they ran directly

contrary to EquiLend's stated purpose of "optimiz[ing] efficiency in the securities finance

industry."

302.    In short, EquiLend is not the independent joint venture that it purports to be.

Instead, it is an empty shell for collusion.  EquiLend's actions should thus be viewed as illegal

concerted activity by Defendants that is subject to Section 1 of the Sherman Act.[32]

303.    Such collaborations among horizontal competitors, regardless of whether they are

organized as a joint venture, pose a high risk of anticompetitive harm.  As the Antitrust

Guidelines for Collaborations Among Competitors issued by the Federal Trade Commission and

Department of Justice explain:

> Competitor collaborations may harm competition and consumers by
> increasing the ability or incentive profitably to raise price above or
> reduce output, quality, service, or innovation below what likely would
> prevail in the absence of the relevant agreement. Such effects may arise
> through a variety of mechanisms. Among other things, agreements may
> limit independent decision making or combine the control of or financial
> interests in production, key assets, or decisions regarding price, output,
> or other competitively sensitive variables, or may otherwise reduce the
> participants' ability or incentive to compete independently.[33]

---

[32]   *See, e.g., Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 200 (2010)
(explaining that a joint venture that is nothing more than a "formalistic shell for ongoing
concerted action" is subject to Section 1 liability); *United States v. Topco Associates, Inc.*, 405
U.S. 596 (1972) (cooperative association made of up grocery stores liable for per se illegal
conduct under § 1); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967) (group of mattress
manufacturers could not escape per se § 1 liability by operating through a single corporation that
they jointly controlled); *see also* Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust
Guidelines for Collaborations Among Competitors 9 (2000) ("*Antitrust Guidelines*") ("In any
case, labeling an arrangement a 'joint venture; will not protect what is merely a device to raise
price or restrict output; the nature of the conduct, not its designation, is determinative.").

[33]   *Antitrust Guidelines* at 6 (emphasis added); *see also id.* at 12 ("Anticompetitive harm
may be observed, for example, if a competitor collaboration successfully mandates new,

304.    That risk is particularly acute here because the Defendants already possess substantial market power (over 70% of the market) and new market developments thus threaten only to "cannibalize their supracompetitive earnings."[34]  Because Defendants already control much of the stock lending market and profit greatly from its opaque structure, they have no incentive to foster innovation, launch new products or services, or improve the quality of existing products or services.  Instead, Defendants have the exact opposite incentive—to preserve the antiquated OTC stock-lending market at all costs, including by working together to stifle procompetitive developments that risk their disintermediation. The adoption of consortium strategies in such markets carries no positive benefits and only "increase[s] the likelihood of an exercise of market power by facilitating explicit or tacit collusion," as occurred here.[35]

## IX.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

305.    Defendants' conspiracy was conducted in secret, since that is the only way it could have prospered.  Defendants also affirmatively concealed their anticompetitive conduct

---

anticompetitive conduct or successfully eliminates procompetitive pre-collaboration conduct, such as withholding services that were desired by consumers when offered in a competitive market.").

[34]    *Antitrust Guidelines* at 15; *see also id.* ("An exercise of market power may injure consumers by reducing innovation below the level that otherwise would prevail, leading to fewer or no products for consumers to choose from, lower quality products, or products that reach consumers more slowly than they otherwise would. An exercise of market power also may injure consumers by reducing the number of independent competitors in the market for the goods, services, or production processes derived from the R&D collaboration, leading to higher prices or reduced output, quality, or service.").

[35]    *Antitrust Guidelines* at 12. Wall Street banks have pursued similar collusive strategies in other markets. One recent study, for example, found "more than 400 instances of large banks involved in at least 63 separate illegal conspiracies." *See* John M. Connor, *Big Bad Banks: Big Rigging and Multilateral Market Manipulation*, American Antitrust Institute Working Paper No. 14-04 (May 5, 2014), https://www.antitrustinstitute.org/sites/default/ files/WorkingPaper14-04.pdf.

from SL-x since the inception of Defendants' conspiracy. As a result, SL-x did not previously discover, nor could it have discovered through the exercise of reasonable due diligence facts comprising its claims, including facts concerning the nature of the injuries alleged above; facts concerning to whose conduct their injuries were attributable; facts concerning when such injuries occurred; and facts concerning the intent, formation, and execution of Defendants' conspiracy.

306.    Defendants' wrongful conduct was carried out, at least in part, through means and methods specifically designed to avoid detection and which, until very recently, successfully eluded detection. In particular, Defendants participated in secret meetings and communications whereby they agreed upon the course of anticompetitive conduct described in this Complaint. These included private meetings of the EquiLend board, which are not open to the public, as well as one-on-one meetings between Defendants' senior executives. SL-x was not present at and had no way to attend or access the proceedings of these secret meetings, and had no way of accessing Defendants' other relevant communications. Defendants also concealed their actions through the use of secret names and code words like "Project Gateway" for their conspiratorial conduct.

307.    SL-x had no reason contemporaneously to know or suspect that these meetings were being used to plan and execute a conspiracy to stifle and boycott innovation. Indeed, the significant and substantial efforts and investments of AQS and Data Explorers along with the financial and other backing of market participants would not have been rational if Defendants' conspiracy had been known. That financial resources were prioritized for these other initiatives by savvy market participants belies any suggestion that Defendants' actions were generally known.

308.    Indeed, Defendants publicly misrepresented to SL-x, along with their customers, potential vendors, and the general public their support for a trading platform that could centrally

71

clear securities lending transactions. Through those false statements, Defendants actively misled SL-x as to the true, collusive, and coordinated nature of their actions. Defendants made these false statements with the purpose and effect of concealing their conspiracy to preserve the opaque OTC market that enabled them to charge supracompetitive spreads for intermediating securities lending transactions.

309.    For example, EquiLend states on its web site that: "In 2000, a group of 10 global financial institutions joined together, looking for ways to optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services. EquiLend Holdings LLC was formed in 2001, and the platform went live in 2002." But as discussed throughout this Complaint, Defendants used EquiLend to achieve the exact opposite ends—i.e., preventing the opaque, OTC securities lending market from evolving into a more efficient, centrally cleared electronic platform with improved price transparency.

310.    Defendants' market power and willingness to use it to silence, punish, and exclude those who dared to cross them is one important reason why their conspiracy was able to operate under the radar until recently. As noted above, Defendants wielded their considerable clout to bully and threaten even large, established entities in the stock loan market. Defendants' threats—and the power behind them—kept those to whom they were directed quiet about the conspiracy they furthered. Those who were targeted feared incurring the wrath of those Defendants on whose services and relationship they depended if they did anything that would inform the market about the strategies to quash emerging market innovation.

311.    The foregoing allegations constitute a continuing violation of the antitrust laws, including misconduct and recurring injuries within the limitations period. Accordingly, SL-x can

recover for damages suffered throughout the limitations period, even absent a finding of equitable tolling or fraudulent concealment.

## VIII.   PENDING LITIGATION WITH SL-X IP S.Á.R.L.

312.    On November 1, 2018, non-party SL-x IP S.á.r.l. filed a complaint against Defendants containing substantially identical allegations to those alleged here.  That case is captioned *SL-x IP S.á.r.l. v. Bank of America Corporation et al.*, Case No. 18 Civ. 10179 (RJS) (S.D.N.Y.) (the "November Action").

313.    In the November Action, SL-x IP S.á.r.l. contended that it had standing to advance the claims presented here as the successor in interest to each of the Plaintiffs.

314.    In briefing a motion to dismiss filed December 21, 2018 in connection with the November Action, Defendants claimed that SL-x IP S.á.r.l. did not have standing to advance its claims and that those claims properly belonged to Plaintiffs.

315.    Plaintiffs bring this action to preserve their right to recover against Defendants should they be deemed the proper parties to vindicate their rights and punish Defendants' illegal antitrust conspiracy.

316.    To the fullest extent possible, this complaint and/or the allegations in this complaint shall relate back to the date the Complaint was filed in the November Action or such earlier time as appropriate.

### CAUSES OF ACTION

### COUNT ONE
### CONSPIRACY TO RESTRAIN TRADE
### 15 U.S.C. §§ 1, 15, 26
### (against all Defendants)

317.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

73

318.   As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to restrict competition in the stock loan market and to jointly boycott SL-x in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

319.   Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

320.   Defendants' conduct in boycotting SL-x cannot be plausibly justified as being intended to enhance overall market efficiency.  Indeed, Defendants failure to use SL-x technology (or a reasonable substitute) leads to slower execution of stock loan transactions and higher rates of failure.

321.   Stock loan transactions are, and are widely perceived by those in the industry to be, a unique financial product.  The market for stock loan in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

322.   Other products are not substitutable for stock loan.  Taking "short" positions on equity securities that an investor does not already own requires that the investor first borrow the security in the stock loan market.

323.   The relevant geographic market is the United States. The Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

324.   As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Plaintiffs has been injured and financially damaged in its

business and property, in amounts that are presently undetermined.  Plaintiffs' damages are directly attributable to Defendants' conduct, which made it impossible for Defendant to successfully launch its product in the United States.   Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

**COUNT TWO**
**CONSPIRACY TO RESTRAIN TRADE**
**N.Y. Gen. Bus. Law § 340**
**(against all Defendants)**

325.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

326.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to restrict competition in the stock loan market and to jointly boycott SL-x in the United States in violation Section 340 of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the Donnelly Act and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

327.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification.

328.    Defendants' conduct in boycotting SL-x cannot be plausibly justified as being intended to enhance overall market efficiency.  Indeed, Defendants failure to use SL-x technology (or a reasonable substitute) leads to slower execution of stock loan transactions and higher rates of failure.

329.     Stock loan transactions are, and are widely perceived by those in the industry to be, a unique financial product. The market for stock loan in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

330.     Other products are not substitutable for stock loan.  Taking "short" positions on equity securities that an investor does not already own requires that the investor first borrow the security in the stock loan market.

331.     The relevant geographic market is the United States.  The Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

332.     As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Plaintiffs have been injured and financially damaged in their business and property, in amounts that are presently undetermined.  Plaintiffs' damages are directly attributable to Defendants' conduct, which made it impossible for Plaintiffs to successfully launch their product in the United States.   Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## COUNT THREE
## TORTIOUS INTERFERENCE
### (against all Defendants)

333.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

334.     Defendants were aware that Plaintiffs had prospective business relations with third parties, including but not limited to Northern Trust, BNY Mellon, and State Street, all of which were potential users of SL-x's software.

335.     By their wrongful acts as alleged herein, Defendants injured prospective business

relations with those potential customers.

336.    Defendants acted with the sole purpose of harming Plaintiffs.

337.    Defendants used dishonest, unfair, or improper means to interfere with Plaintiffs'

prospective business relations.

338.    Plaintiffs were damaged by reason of Defendants' conduct.

## COUNT FOUR
## UNJUST ENRICHMENT
### (against all Defendants)

339.    Plaintiffs re-allege and incorporate by reference each and every allegation in each

and every preceding paragraph as if fully set forth herein.

340.    By their wrongful acts as alleged herein, Defendants have been unjustly enriched

at the expense of Plaintiffs by, among other things, continuing to enjoy wider bid/ask spreads in

the stock lending market, and engaging in an illegal conspiracy to undermine SL-x and divert

any potential pecuniary benefits from its platform to themselves through unfair and

anticompetitive trade practices.

341.    Based on equity and good conscience, restitution is required.

## COUNT FIVE
## DECEPTIVE TRADE PRACTICES
## N.Y. Gen. Bus. Law § 349
### (against all Defendants)

342.    Plaintiffs re-allege and incorporate by reference each and every allegation in each

and every preceding paragraph as if fully set forth herein.

343.    The New York Deceptive Practices Act, Gen. Bus. Law § 349, declares unlawful

any deceptive acts or practices in the conduct of any business, trade, or commerce, or in the

furnishing of any service in this state, whether or not subject to any other law of this state, and

allows any person who has been injured by reason of any violation of that statute to bring a private action.

344.    As alleged above, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in restraint of trade to allocate the stock lending market between themselves, and jointly boycott SL-x and other entities that would introduce competition on stock loan rates in the United States. Such conduct was misleading, deceptive, and unlawful.

345.    Defendants' improper conduct had a broad application on consumers generally throughout the United States and abroad by undermining competition in the stock lending market and preventing all-to-all stock lending.

346.    As a result of Defendants' combination, conspiracy, and arrangements in violation of the New York Deceptive Practices Act, Gen. Bus. Law § 349, Plaintiffs are entitled to recover its actual damages, plus punitive damages and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiffs pray that this Court:

A.    Award nominal, compensatory, treble, and punitive damages to Plaintiffs in an amount to be determined at trial;

B.    Award litigation costs and expenses to Plaintiffs, including, but not limited to, reasonable attorneys' fees;

C.    Award pre-judgment and post-judgment interest for damages suffered by Plaintiffs.

D.    Award any additional and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable

**DATED:**    New York, New York
May 24, 2019

By:  _____
Rishi Bhandari

MANDEL BHANDARI LLP
Rishi Bhandari
Robert Glunt
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667
glunt@mandelbhandari.com

*Attorneys for Plaintiffs*